[Crim. No. 2572. In Bank.—December 4, 1923.]

## THE PEOPLE, Respondent, v. J. V. HENDRIX, Appellant.

[1] CRIMINAL LAW—MURDER — MOTIVE — EVIDENCE.— In a prosecution for murder, evidence tending to prove that after the murder defendant committed an act or acts of sexual intercourse with the wife of deceased is admissible as tending to show motive for the crime charged.

[2] ID. — MOTIVE — EVIDENCE OF OTHER CRIMES. — Evidence of crimes other than the one for which a defendant is on trial is not usually admissible; but to such rule there are exceptions; and where evidence is material as tending to show the intent or motive of the defendant in the commission of the offense for which he is being tried, the fact that it also tends to prove the commission of another offense by him will not warrant its exclusion.

[3] ID. — PHYSICAL CONDITION OF DECEASED'S WIFE — ADMISSION OF PHOTOGRAPH—STATE OF MIND—EVIDENCE—ABSENCE OF PREJUDICE. In a prosecution for murder, it cannot reasonably be held that the admission of a photograph of the wife of the deceased showing the condition of her legs after fleeing from the defendant over mountains in her nightgown and without shoes or stockings in order to escape the defendant's assaults, and that she was in an agitated state of mind on reaching the city, was of any substantial prejudice to the defendant, where the prosecution had introduced in evidence, without objection, practically all such details.

[4] ID.—REPUTATION FOR CHASTITY—REJECTION OF PART OF TESTIMONY —EFFECT OF.—In such a prosecution, where the defendant produced a number of witnesses to prove that the general reputation of the wife of the deceased for chastity was bad, and as to some of these witnesses the evidence was received and as to one or possibly two it was excluded, the defendant could not have been prejudiced by the rejection of a part of the proffered testimony where the part which was admitted was clear and direct and it cannot be said it was not sufficient to enable the jury to determine the question involved.

[5] ID. — LACK OF CHASTITY — IMPEACHMENT. — Evidence of lack of chastity on the part of the wife of the deceased was not admissible to impeach her credibility.

---

2. Admissibility of evidence of other crimes to prove motive or intent, notes, 105 **Am. St. Rep.** 986; 7 **Ann. Cas.** 66; 62 **L. R. A.** 199, 214.

3. Use of photographs as evidence, notes, 75 **Am. St. Rep.** 477; 35 **L. R. A.** 802; 51 **L. R. A. (N. S.)** 843.

[6] ID.—CUMULATIVE TESTIMONY—LIMITATION AS TO NUMBER OF WIT-
NESSES—POWER OF COURT.—In such a prosecution, the rejection
of the testimony of two of defendant's witnesses as to the reputa-
tion of the deceased's wife for truth, honesty, and integrity
amounted to no more than a reasonable limitation on the number
of witnesses on the subject, where the rejected testimony was,
but cumulative; nor could prejudice result to the defendant where
no attempt was made by the prosecution to controvert the testi-
mony that said witness' reputation for veracity was bad.

[7] ID.—REMARKS OF DISTRICT ATTORNEY—ABSENCE OF MISCONDUCT.
In such prosecution, where during the argument of the case the
district attorney stated that the defendant claimed that the de-
ceased threw a stick of stovewood at him, whereupon the defend-
ant's counsel assigned this remark as misconduct, adding that
there was no evidence that the wood thrown was firewood or stove-
wood, and the evidence was merely that it was a stick of wood,
and the district attorney, referring to this interruption, stated that
it showed to what technicalities counsel was resorting to save the
"neck of this defendant," it cannot be seriously urged that the de-
fendant was at all prejudiced by the incident in view of the
fact that the jury was admonished by the trial court to pay no
attention to such matters.

APPEAL from a judgment of the Superior Court of
San Diego County and from an order denying a new trial.
Spencer M. Marsh, Judge. Affirmed.

The facts are stated in the opinion of the court.

Edward J. Kelly for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones,
Deputy Attorney-General, for Respondent.

KERRIGAN, J.—Defendant was tried in the county of
San Diego for the killing of one Thomas Kester, and was
found guilty of murder in the first degree. He moved for
a new trial and, the motion being denied, he was sentenced
to suffer the penalty of death. This appeal is from the
judgment and the order denying a new trial.

In the early part of the summer of 1922 the defendant,
J. V. Hendrix, Thomas Kester, the deceased, and the wife
of the latter met in a lumber camp in the northern part
of the state. There they entered into an agreement to en-
gage in the unlawful manufacture and sale of whisky in

San Diego County. A little later the two men worked in a lumber camp at a place called Sterling. They left there for San Diego, taking with them the sum of three hundred dollars, saved from the earnings of the two men, and which was deposited with Mrs. Kester as treasurer. With this sum they purchased the equipment for a still. From Sterling to San Diego the party traveled in an automobile belonging to Kester, camping at night at various points on their way. At the lumber camps and while traveling the defendant took his meals with the Kesters and slept near their tent. About two weeks after arriving in San Diego they rented a small piece of land in a secluded part of the county, and there installed the still in a small adobe building and put it into operation. Kester and his wife slept in a tent a short distance from the still and the defendant occupied a bunk near by.

On the evening of August 14, 1922, the defendant ate no dinner, stating that he was indisposed. Later Mrs. Kester, having finished her housework, joined the defendant and her husband at the still where they were engaged in general conversation, nothing unusual occurring. At 9 o'clock she bade the two men goodnight, went to her tent and retired for the night. At 9:30 she heard her husband say to the defendant, "To-morrow we will go to San Diego and Thursday we will go to Warner's Hot Springs." Following this remark she heard a crash and a thump five or six times, whereupon she hurriedly arose and left her tent, calling out, "What's the matter?" The defendant replied, "Nothing's the matter." To an inquiry after her husband the defendant stated that he had gone over the hill for water. Just then she heard the voice of her husband, faint and growing fainter with each word, saying, "Help me, dear, help me!" immediately followed by "thud, thud, thud, as if of something hitting upon wood," to quote the words of Mrs. Kester. Thereupon, knowing that something was wrong and dressed only in a nightgown, she fled from the camp. While endeavoring to crawl under a tight board locked gate about one hundred yards from the still she was overtaken by the defendant, who grabbed hold of her, threw her on the ground, called her a "nasty puppy," and said, "You are mine now," and there attempted to and to some extent did have sexual intercourse with her. She admits

that she threw her arms around his neck and said, "Oh, John, I am so excited," and that she did not resist the assault, but she states that what occurred was against her will, and at the trial the prosecution attempted to show that her nonresistance was prompted by fear. The defendant then told her that her husband was dead. He also asked her how much money she had and said he was going to take her to Louisiana. They spent about thirty minutes at the gate, when the defendant took her to the tent. On the way there they stopped at the still to enable the defendant to place a jar so as to save a wasting of the distilling whisky. Thereupon they went to bed for the night, when he again attempted an act or acts of sexual intercourse with her. He also at this time said to Mrs. Kester, "In the morning I will bury Tom, and you get breakfast, and we will head over across the Rockies in the machine"; also, "I will go to the gallows for you. You nasty little thing, why didn't you approach me before? Why did I have to do this to approach you?" Then hearing a dog snore, Mrs. Kester pretended to believe that "Tom" was "coming to life," and persuaded the defendant to go out and investigate, and when he did so she slipped out of the tent, made her escape over the mountain in her nightdress, without shoes or stockings, and reported the slaying of her husband to the authorities at San Diego.

While the Kesters and the defendant were in San Diego looking for a location for a still, the Kesters lived with Mrs. Kester's parents, and the defendant lived next door in a vacant house, Mrs. Kester doing the cooking for him. The Kesters were married in April, 1922. Mrs. Kester was twenty-four years old and her husband was forty-two. He was tall and weighed two hundred pounds. He was blind in one eye and the sight of the other eye was impaired. As a result of a severe attack of rheumatism his right arm and leg were shorter and thinner than the left arm and leg. The defendant was fifty-two years old, was in good health, and weighed one hundred and seventy pounds.

The autopsy surgeon, Dr. John J. Shea, examined the body of the deceased, and found that he had been beaten to death by a blunt instrument, all of the wounds being on the back of the head.

The county coroner, S. C. Kelley, testified that on the morning of August 15th, he visited the site of the homicide, accompanied by deputy sheriffs Sexson and McNett. They found the body, a pick-handle with stains of blood on it, and a loaded Winchester rifle in the defendant's bunk. Within about fifteen minutes after the deputy sheriffs left to return to San Diego a man appeared on the scene who later proved to be the defendant. He said to Coroner Kelley that his name was Henderson, that he was a neighbor living with his family over the hill, that he had heard some shooting and he came to learn what the trouble was. Later, during the conversation, he told the coroner that his name was Johnson. Subsequently, on the return of Deputy Sheriff McNett, the defendant was put under arrest, and at that time he denied that he knew anything about the death of Kester. He stated to a newspaper reporter, Albert E. Brown, that he had to kill Kester for he was coming at him with a stick of wood. He also told this witness that he had been intimate with Florence Kester and that they had planned to run away. The rifle which was found in defendant's bunk was usually kept in the tent of the Kesters. A blunt piece of iron, which Mrs. Kester said she had seen in the defendant's bunk a few days before the slaying, was found near the still-house, and on it there were blood stains, hair, and a piece of skin.

As before stated, the defendant claimed that the killing of the decedent was in self-defense. In that behalf he testified that on the 10th of August, while he and Mrs. Kester were alone, he had told her that she had a pretty foot, and Kester, having overheard the remark, later, and in the absence of Mrs. Kester, told him that a man who "would brag on another man's wife was a son-of-a-bitch." To this statement the defendant made no reply, walked away and the matter was dropped. On the fatal evening of August 14th, after Mrs. Kester had retired for the night, the decedent and the defendant had a dispute about how much material should be drawn from the still, the deceased saying that in this instance he was going to have his way; that the deceased called the defendant a son-of-a-bitch and hit him over the head with an empty quart bottle. The defendant got up from his sitting position and turned to the door of the still. Deceased threw a piece of wood at him, also a pick handle. The deceased's aim was poor, and neither of these missiles

hit the defendant. The defendant seized the pick handle, and as the deceased was advancing toward him with another piece of wood in his hand the defendant knocked the piece of wood out of the deceased's hand. Then the deceased pulled a knife out of his belt, whereupon the defendant hit the deceased two blows on the head with the pick handle, the deceased falling near the bunk of the defendant, on the second of these blows. At this juncture . the deceased picked up a piece of iron and again advanced upon the defendant. Then the defendant struck the deceased another blow, felling him. Deceased dropped the piece of iron, and when he arose he was standing within arms-length of an oak tree and reached for a rifle which he had previously placed there, saying, "Damn you, I will put your light out." Then, says the defendant, "I hit him the last blow." Subsequently, the defendant looked for Florence Kester and found her, when she answered a call, standing down the road at the first gate. Upon approaching her she threw her arms around him saying, "Oh, John, I am so excited." They walked back to the cook-house, where they each had a drink of whisky, and at his suggestion she made some coffee, which they also drank. Subsequently, they went out to the still-house together, and while there she helped the defendant adjust a jar to prevent the waste of malt, and at her request the defendant turned the body of her dead husband around so that his head was lying uphill. This being done, she said, "I believe I will see how much money he has," and she took ten dollars out of his pants pocket. Then they went back to the tent. Thereafter, the defendant left the tent and on returning ten minutes later he found that Mrs. Kester had gone. Defendant further testified that he neither had nor attempted to have sexual intercourse with Mrs. Kester that night, but admitted that their relations had been intimate, commencing with the last afternoon in Sterling, and continuing up to shortly before the slaying of her husband. Defendant further testified that at the time of the killing he, the deceased, and the woman were all somewhat under the influence of liquor.

The morning after the slaying, the defendant, in answer to a question by a deputy sheriff, said, "I hit the son-of-a-bitch because he threw a stick of wood at me," and for the reason that "I believed that my life was in danger."

It was not until the trial that the defendant claimed that he had been hit on the head with a bottle, and that he had been attacked by the deceased with a stick of wood, a pick handle, another stick of wood, a knife, a piece of iron and a rifle.

It might also be well to state that the officer who made a careful physical examination of the defendant shortly after his arrest found no swelling or any mark on his head tending to support defendant's assertion that he had been hit there with a bottle by the deceased.

According to the testimony of the officers, the dust on the ground around the body of the deceased tended to show that the body had been turned around as testified to by the defendant.

No claim is made that the evidence is insufficient to sustain the verdict; and it is clear that there is abundant evidence in the record which, if believed by the jury, showed the defendant to be guilty of a cruel and deliberate murder.

[1] Over the objection of defendant evidence was admitted tending to prove that after the murder defendant committed an act or acts of sexual intercourse with Mrs. Kester. This evidence was offered, and we think was admissible, as tending to show a motive for the crime charged. [2] It is true that evidence of crimes other than the one for which a defendant is on trial is not usually admissible; but to this rule there are exceptions; and where evidence is material as tending to show the intent or motive of the defendant in the commission of the offense for which he is being tried, the fact that it also tends to prove the commission of another offense by him will not warrant its exclusion.

In the case of *People* v. *Craig*, 111 Cal. 460 [44 Pac. 186], the defendant murdered his wife, and shortly thereafter he went to a place several miles distant, where he killed her parents. It was held that evidence of the killing of the parents was admissible to show that the killing of both of them and their daughter was part of a common plan, and was relevant to establish the motive for the crime for which the defendant was on trial, and that the evidence could not be excluded because it tended to establish another and different offense.

In *People* v. *Cook,* 148 Cal. 334, 339 [83 Pac. 43], it was held that evidence was admissible tending to prove the existence for some time prior to the homicide of an incestuous relation between the defendant and his daughter, the purpose of the evidence being to establish a motive for the killing of a young man who had made improper amatory advances to the young woman. In addition to the jealousy which such advances might reasonably be considered to have aroused in the defendant, it was suggested as an additional reason for allowing the testimony that the defendant might have feared that if the young man had succeeded in winning the girl's favor he would discover and expose the criminal relation, the fear of such exposure also furnishing a motive for the crime.

In the case at bar we think the evidence was clearly admissible to show motive, for, according to the testimony of Mrs. Kester, immediately after the slaying the defendant not only attempted to have sexual intercourse with her against her consent, but he also asked her in effect why she had not consented to this relationship before and saved him the necessity of killing her husband. He also proposed they should flee the locality together and go to Louisiana, where he had previously resided. The case is similar to *People* v. *Cook, supra,* in that both the defendants endeavored to establish that the killing was done in legitimate self-defense; and each being charged with murder, the evidence of motive was not only material but important. That the jury might infer one in the present case from the existence of a desire on defendant's part to continue or initiate a liaison with the wife of the deceased will hardly be disputed, especially in a case where the defendant attempts acts in pursuance of such relation before the body of his victim is cold.

[3] Apparently for the purpose of showing that Mrs. Kester did not in fact consent to defendant's acts, the prosecution, over the objection of defendant, was permitted to introduce evidence showing the effects of her efforts to escape them. To this end a photograph was admitted showing the cut, bruised, and scratched condition of Mrs. Kester's feet caused by contact with rocks, brush, and barbed wire on her way to San Diego, and of her condition of mind on arriving there. In this behalf defendant contends that admitting, for the sake of argument, that the prosecution was

entitled to introduce evidence of the assault for the purpose
of proving motive, still it should have been confined to evi-
dence of the bare assault without any of the details thereof.
The prosecution had, however, introduced in evidence, with-
out objection, practically all such details and of what fol-
lowed the assault, including, among other things, all that was
said and done by Mrs. Kester and the defendant both at the
gate and in the tent immediately following the slaying; also
of her flight over the mountains in her nightgown and with-
out shoes or stockings. Consequently it cannot reasonably
be held that the admission of the photograph showing the
condition of her legs and that she was in an agitated state
of mind on reaching San Diego was of any substantial preju-
dice to the defendant.

[4] The defendant produced a number of witnesses to
prove that the general reputation of Mrs. Kester for chas-
tity was bad. As to some of these witnesses the evidence
was received. As to one or possibly two it was excluded.
It is urged on behalf of the defendant that in rejecting any
of the proposed testimony the court committed prejudicial
error. It is doubtful whether the question of the excluded
testimony is so presented by the record that it calls for de-
termination, but we shall, nevertheless, pass on the merits of
the rulings. The testimony was apparently offered to rebut
the evidence of the prosecution, already referred to, relating
to defendant's asserted conduct in attempting to have or
having sexual intercourse with Mrs. Kester after the killing,
which evidence was admitted on the theory that the defend-
ant's desire to possess the woman furnished a motive for the
murder. Assuming, without deciding, that evidence of gen-
eral reputation for lack of chastity at a period several years
before the killing is competent to rebut evidence of motive
for the murder, yet it does not appear to us that the de-
fendant could have been prejudiced by the rejection of a
part of the proffered testimony. The part which was ad-
mitted was clear and direct and we cannot say it was not
sufficient to enable the jury to determine the question in-
volved. [5] And if it is contended that the evidence of the
lack of chastity was admissible for the purpose of impeach-
ing the credibility of Mrs. Kester, the contention is without
support in the authorities. (*People* v. *Yslas,* 27 Cal. 630;
*People* v. *Johnson,* 106 Cal. 289, 293 [39 Pac. 622].)

192 Cal.—29

[6] Defendant also complains that the testimony of two of his witnesses as to the reputation of Mrs. Kester for truth, honesty, and integrity was improperly excluded. It appears to have been rejected upon the ground that it was too remote, it appearing that the witnesses knew nothing about her reputation in the respects mentioned for the period of approximately two and a half years last past. Assuming contrary to the great weight of authority (*Guardianship of Akers*, 184 Cal. 514 [194 Pac. 706]; 3 Wigmore on Evidence, 2d ed., sec. 1617; 22 Cor. Jur. [Evidence], sec. 575; *Lawson* v. *The State*, 32 Ark. 220; *State* v. *Lanier*, 79 N. C. 622; *People* v. *Nunley*, 142 Cal. 441, 445 [76 Pac. 45]), that this testimony was too remote and that the court did not abuse its discretion in rejecting it on this ground, still the court's action in this regard amounted to no more than a reasonable limitation on the number of witnesses on the subject. The rejected testimony was but cumulative, and in such case the trial court may properly limit the number of witnesses. It is not seriously urged—nor could it be under the attending circumstances—that the limitation was unreasonable, or that prejudice resulted to the defendant, especially as no attempt was made by the prosecution to controvert the testimony that said witness' reputation for veracity was bad. (*People* v. *Yokum*, 118 Cal. 437, 441 [50 Pac. 686]; 4 Wigmore on Evidence, sec. 1908; *People* v. *Burke*, 18 Cal. App. 72, 89 [122 Pac. 435]; *People* v. *Murray*, 41 Cal. 66.)

The defendant makes two assignments of misconduct: (1) During the examination of a witness the court stated that there was a discrepancy as to the date of the homicide—whether or not the morning following was the 14th or 15th of August. That there was such a discrepancy is not disputed. [7] (2) During the argument of the case the district attorney stated that the defendant claimed that the deceased threw a stick of stovewood at him, whereupon the defendant's counsel assigned this remark as misconduct, adding that there was no evidence that the wood thrown was firewood or stovewood. The evidence was merely that it was a stick of wood. The district attorney, referring to this interruption, stated that it showed to what technicalities counsel was resorting to save "the neck of this defendant."

In regard to the first of these assignments, the matter is so trivial as not to require consideration. The second is scarcely more serious; but in any event the jury was admonished by the court to pay no attention to such matters, and it cannot be seriously urged that the defendant was at all prejudiced thereby.

Because of the gravity of the case we have examined with painstaking care the record and the points advanced by the defendant. We find no substantial error, and are entirely satisfied that the defendant had the benefit of a fair trial.

The judgment and order are affirmed.

Richards, J., *pro tem.*, Lawlor, J., Myers, J., Wilbur, C. J., Waste, J., and Seawell, J., concurred.