[Civ. No. 22342. Second Dist., Div. One. Aug. 23, 1957.]

REDONDO BEACH SCHOOL DISTRICT OF LOS ANGELES COUNTY, Respondent, v. IDA FLODINE et al., Defendants; B & A INVESTMENT COMPANY, INC. (a Corporation), Appellant.

*Assigned by Chairman of Judicial Council.

438

Samuel Maidman for Appellant.

Harold W. Kennedy, County Counsel, and Lloyd S. Davis, Deputy County Counsel, for Respondent.

FOURT, J.—This is an appeal by defendant B & A Investment Co., Inc., from an interlocutory judgment in a condemnation action. The plaintiff school district commenced the action on March 15, 1956, for the purpose of acquiring the property in question for an elementary school.

From the evidence, and by the way of background, it is fair to state that Ida C. Flodine and Eric Flodine were husband and wife and the owners, as joint tenants, of a parcel of real property, irregularly shaped, known as Lot 1, Block 8 of Tract 11336, as per a recorded map, and containing about 3.20 acres, located at or near the southwest corner of Manhattan Beach Boulevard and Inglewood Avenue, in the city of Redondo Beach. Eric Flodine died November 28, 1952, and the property in question was listed as an asset in his estate.

On July 30, 1954, Ida C. Flodine, as the seller, and B & A Investment Co., Inc., a corporation, as the buyer, executed certain escrow instructions wherein appellant was to put up $500, and agreed to deposit "the further sum of $19,500.00, plus funds to cover my buyers charges and prorations, when the conditions of this Escrow are met and prior to its closing." The property involved in that escrow consisted of the entire Lot 1, Block 8 of Tract Number 11336, as per a designated map. It was also set forth, under the buyer's section of the escrow, that the purchase of the property was subject to the buyer procuring a rezoning of a part of the property, and subject to the buyer getting suitable financing. Further it was provided that separate and apart from all other provisions of the escrow, the buyer would have the privilege to acquire a separate deed, during the period of the escrow, to a parcel 150 feet by 150 feet of the larger, or entire lot, which amounts to about .52 acres, at the corner, upon paying $20,000 through the escrow, which amount would be deducted from the entire purchase price, leaving a balance of $45,000 due for the remainder of the lot. The $45,000 was to be paid through a system of notes, secured by second trust deeds on the property.

On August 20, 1954, Ida Flodine, individually, and as the executrix of the estate of Eric Flodine, deceased, as the owner, entered into an agreement with B & A Investment Company, Inc., for the sale and purchase of the entire parcel of land known as Lot 1, Block 8 of Tract Number 11336. The agreement set forth that it did not cancel the escrow instructions heretofore referred to, but that it was intended to

clarify the instructions, and if there was any conflict between the escrow instructions and the agreement, that the agreement was to prevail. The agreement provided, among other things, that the appellant would pay the sum of $65,000, for the entire property, payable $20,000 cash and $45,000 by the execution of promissory notes secured by trust deeds upon the property, second and subject to a first trust deed for a construction loan which appellant proposed to obtain for the purposes of financing its proposed construction work on the property.

It appears in the agreement of purchase and sale just mentioned that "Eric Flodine in his lifetime entered into an agreement in writing with the City of Redondo Beach, California under the terms of which certain improvements consisting principally of the laying of sidewalks and curbing around said property were to be done by said Eric Flodine" and that Ida Flodine was "now obligated to said City for the doing of said work, or paying for the same." The appellant, by the agreement of sale and purchase, agreed to make the improvements required by the city, or such substitute improvements as might be satisfactory to the city. It was also provided that an escrow would be opened and that during the escrow period the appellant would have the right to acquire a separate deed to the parcel 150 feet by 150 feet, on the corner of the larger parcel, on the condition that $20,000 be paid to the seller through escrow, which $20,000 was to be deducted from the total purchase price of $65,000, leaving a balance of $45,000 for the purchase price for the remainder of the property. The appellant was to proceed with a subdivision of the premises. The seller was to take appropriate steps to procure court approval of the agreement, or to close the probate proceedings in her husband's estate. The appellant was to be given ninety days to arrange financing and "that if he fails to procure the necessary financing within said time, either Party may, at their election, cancel this agreement and terminate the escrow." And, further it was provided, "Neither this agreement, nor the escrow instructions to which it refers, may be regarded as an option, but is in effect an actual sale subject only to the failure of Second Party to procure, after diligent effort, from the City of Redondo Beach, favorable action with regard to the proposed subdivision and the zone changes herein referred to, or the financing herein referred to."

On January 24, 1955, two new escrows were set up by

Ida Flodine, individually, and as executrix of the estate of Eric Flodine, deceased, as the seller, and appellant, as the buyer. In each of such new escrows it was provided that the signing of "these Escrow Instructions by the buyer and seller will cancel and supersede . . . Escrow Instructions as dated July 30, 1954." It was provided in the first of the new escrow instructions that the buyer would deposit $22,500 on or before April 30, 1955, for the purchase of, and the seller would accept such sum for, the parcel 150 feet by 150 feet on the northeast corner of Lot 1, Block 8 of Tract Number 11336, as per described recorded map.

On February 21, 1955, instructions were filed in the first of the new escrows by Ida Flodine, individually and as executrix of the estate of Eric Flodine, deceased, modifying the previous instructions. The escrow holder was directed by her to withhold from the payment to her, and to keep in that escrow for payment of certain street improvements, the sum of $13,000, the money to be used as follows:

"On March 6, 1950 I entered into a contract (with my husband) with the City of Redondo Beach wherein we agreed to make certain improvements in Tract No. 11336, Block 8, in the City of Redondo Beach, in accordance with plans and profiles mentioned in said agreement. Said improvements were to be made to the satisfaction of the City of Redondo Beach. Such improvements I will now make, and said sum of $13,000 is set aside for the payment of same. However, I have agreed with the City of Redondo Beach that the payment of labor and material and all construction costs of the improvements described in said contract made on March 6, 1950 will only be made out of said $13,000 when and if and as approved by Mr. F. E. Hopkins, City Manager and Street Superintendent of said City of Redondo Beach. You will therefore hold said $13,000 in escrow for said purpose and pay the same to parties furnishing materials for or doing work upon the streets and public places in said tract in the performance of said agreement, upon an order signed by me and approved by Mr. F. E. Hopkins, City Manager and Street Superintendent of said city, and not otherwise. In the event said work is completed to the satisfaction of said city, and you have an approval and authority from the said Mr. F. E. Hopkins so to do, any balance remaining in said fund, after the payment of said bills and expenses, will be paid to me."

On May 6, 1955, there were further supplemental escrow

instructions filed in the first of the new escrows wherein it was set forth that Ida Flodine delivered into the escrow a deed executed by her individually, which was to be recorded concurrently with an executrix' deed theretofore delivered into the escrow, which was in accordance with an order confirming sale of the estate of Eric Flodine; that certain assessments, demands and taxes were to be paid, and with reference to the $13,000 item it was set forth that "a certain portion of the cost of said work is to be undertaken by the buyer relative to improvements immediately adjacent to the 150' by 150' corner."

The second of the new escrows had to do with Lot 1, Block 8, excepting therefrom the 150 foot by 150 foot parcel at the corner, containing about 2.68 acres, and which is the real property involved in this action. In this escrow the buyer agreed to deposit $1,000 upon the signing of the instructions, and further, "that the within named buyer will proceed with the necessary engineering and maps for the purpose of subdividing the herein described land into suitable lots or building sites, to be approximately 18 Lots; and you are instructed that the undersigned seller and buyer have agreed that at the proper time the buyer will execute in favor of the Seller separate Second Trust Deeds and Notes, which by their terms will be second and subject to the separate 1st trust deed construction loans, to be dated concurrently or subsequent to said 1st Trust Deed documents, and are to describe and be a lien against a separate lot, as per Subdivision Map to be engineered and filed for record in the regular channels of forming a proper legal subdivision. The amount of each 2nd Trust Deed & Note is to be determined, and you will be given proper Supplemental Escrow Instructions thereon, by the number of Lots in the Subdivision Map to be filed, and each 2nd Trust Deed and Note representing the balance of the total purchase price given in these Instructions would be divided equally and in ratio to the number of Lots in the proposed Subdivision. All Second Trust Deeds and Notes from the Buyer in favor of the Seller are to be payable in installments equal to 1% per month, or more, including interest at the rate of Six (6) per cent per annum, 1st payment to commence 30 days after the date of completion of building."

The seller, in substance, in her instructions in this latter escrow, agreed to sell the property so described for $42,500, less expenses.

On May 6, 1955, an officer of the escrow holder directed a letter to the city of Redondo Beach with reference to the first of the new escrows, having to do with the sale of the 150 foot by 150 foot parcel, wherein it was set forth that the escrow company had been directed to withhold $13,000 from the funds derived from the sale of the land for payment of certain improvements of certain streets and otherwise, and that it was understood that the city would effect a zone change as to the 150 foot by 150 foot parcel to a C-2 zone. It was also set forth that "the final consummation of our Escrow is contingent upon receipt of the City of Redondo Beach letter in proof that the said 150' X 150' corner above referred to is in fact re-zoned to C-2 Zone, and accordingly we respectfully request that the necessary and proper letter, in quadruplicate, does reach this office at the earliest possible date."

On May 11, 1955, the city clerk of Redondo Beach directed a certified copy of Ordinance Number 1473 to the escrow company. That ordinance was adopted May 9, 1955, by the city council, and provided that the 150 foot by 150 foot corner parcel be reclassified and rezoned from a P-1 zone to a C-2 zone. No conditions were set forth in the ordinance, there were no references to any other property or any other improvements, and it was to become final thirty days thereafter.

On May 18, 1955, a deed from Ida Flodine, individually, and a deed from Ida Flodine, as executrix of the estate of Eric Flodine, were recorded. In each of such deeds the 150 foot by 150 foot parcel was granted to the appellant herein. The executrix' deed recites that the consideration was $22,500 cash, and that it was pursuant to notices and an order of the superior court confirming the sale. The individual deed recites that the deed was "For a Valuable Consideration, receipt of which is hereby acknowledged," without naming the amount or otherwise. The appellants caused to be prepared and submitted to the planning commission of the city of Redondo Beach a proposed subdivision of only a part of the property described in the second of the new escrows, which proposed subdivision was approved June 2, 1955, by the planning commission, subject to a long list of improvements recommended by the various departments of the city government, including sidewalks, curbs, gutters, sewers, gas and water lines, street light standards, parkway tree planting, and fire hydrants, fire hydrants at locations other than on the subdivided portion because "only part of the vacant

land [was] being subdivided," provisions for a cash deposit to secure the installment of certain ornamental light or power poles and many other similar items. The appellants were, by the tentative or conditional approval, given one year within which to present an accurate subdivision map to comply with certain ordinances.

On July 28, 1955, Ida Flodine requested an extension of time to September 10, 1955, within which to close the escrow for the reason that it appeared impossible to close the estate of Eric Flodine, deceased, until the early part of September, 1955. The request was approved by the appellants.

Before any final subdivision map had been prepared· and submitted to and approved by the city, and before any re-zoning of the area described in the new second escrow here-tofore mentioned, the school district, by resolution dated March 8, 1956, commenced proceedings to condemn the area in question in this action, which action was filed March 15, 1956. As heretofore stated, the property sought to be con-demned is irregular in shape, containing about 2.68 acres, parts of which are C-2 (general commercial zone), and the remainder is P-1 (automobile parking zone).

Appellant claimed an interest in the property by virtue of the escrow instructions executed by Ida Flodine, individ-ually, and as the executrix of her husband's estate. An ob-jection by counsel for the plaintiff that appellant did not have a compensable interest in the property and therefore should not be permitted to testify as to the value of the prop-erty was overruled and appellant did introduce testimony as to the value of the property. During the course of the trial it was stipulated between the defendants that "out of such award as the Court may determine to be the value of the subject property, said award shall be awarded in the following manner: To Ida C. Flodine, the sum of $42,500; and the balance of any of the award, if any, to B. & A. In-vestment."

At the start of the trial, and before any witnesses were called to testify as to the value of the property, the court asked the respective defendants if they intended "to offer evidence of the value of this property separately, that is, through witnesses called separately by the two defendants?" Counsel for the plaintiff indicated that he would have one ex-pert witness. Counsel for defendant Ida Flodine stated, in substance, that he had but one expert witness. Counsel for the appellant indicated that he would "have one appraiser"

and "two other witnesses, who are real estate brokers"; the two brokers to "establish some of the phases of value *which may not* be covered by our, appraiser expert." (Emphasis added.) The judge thereupon directed that he would limit the defendants to two experts.

The opinions as to the fair market value of the property, as of March 15, 1956, were as follows:

Alvin Wechsler, the president of B & A Investment Company, Inc., for that company—$113,500;

Howard Martin, for B & A Investment Co., Inc.—$150,000;

Sydney E. Best, for Ida Flodine—$65,000; or $85,000 or $110,000 (witness gave three different values in his testimony);

John R. Williams, for the school district—$38,000.

After lengthy examination and cross-examination of the respective witnesses, the introduction of many pictures of the land in question and maps and plats thereof, it was stipulated that the judge could view and inspect the property, and he did so. Thereafter, findings of fact and conclusions of law were made, wherein it was found that the market value of the property, together with any and all improvements thereon, was, on March 15, 1956, the sum of $45,000. It was set forth in the findings that, "The court makes no findings with respect to the ownership, right, title, or claim in and to the sum of $13,000.00 alleged to be on deposit in escrow as security for the construction of the improvements purported to be required by the City of Redondo Beach as a condition for the approval by said city of plans heretofore proposed for the subdivision of said property."

Appellant's contentions are that: (1) The court committed error by its refusal and failure to make a finding in connection with the deposit of $13,000; (2) the court committed error by refusing to allow testimony concerning the probability of a change in the zoning of the subject property; (3) the court abused its discretion in limiting appellant to one expert witness, and (4) the court's valuation of the property was inadequate and not consistent with an evaluation based upon uses to which the subject property was best adapted and capable of being used.

There was no particular or specific allegation in any of the pleadings with respect to any obligation which might arise out of the $13,000 on deposit in the first of the new escrows which such escrow had to do with the purchase and sale of the 150 foot by 150 foot parcel on the northeast corner

of Lot 1, Block 8 of Tract 11336. If there was any such an agreement (presumably in writing) between Ida Flodine and the city, it was never introduced into evidence, and obviously the agreement itself was the best evidence of what it contained. Assuming for the moment that it was proper to consider it, the court could not, without the agreement determine to what extent, if any, the subject property was benefited by the agreement.

We believe that if the appellant wanted that matter litigated it should have put the matter at issue by a proper pleading, and have brought all of the parties concerned therewith into court. It is apparent that a part of the $13,000, was to be used for the improvements on the 150 foot by 150 foot parcel, which was sold before this action was commenced, and was not involved in this condemnation proceeding. At once it is obvious that the court could not, under the circumstances, make any proper and definite breakdown between the part which went to the corner lot and the part which went to the remainder thereof. Further, there was no evidence of the actual cost of the improvements, if any.

We believe that for the purposes of this action the agreement, if such there was, between Ida Flodine and the city, with reference to the $13,000 deposit, having to do with the 150 foot by 150 foot parcel, was separate and apart from the land involved in this action.

■ Coming to appellant's next contention, apparently appellant intended to subdivide a part of the property in some way or other and ultimately to subdivide all of it, but the usual rule in eminent domain proceedings is that a proposed plan for the development of the property proposed to be taken is not material on the issue of market value. (*Los Angeles* v. *Kerckhoff-Cuzner Mill & Lbr. Co.*, 15 Cal.App. 676 [115 P. 654]; *Redwood City etc. Sch. Dist.* v. *Gregoire*, 128 Cal.App.2d 766, 773 [276 P.2d 78].)

It is clear that under certain circumstances the probability of a change of zone may be shown, and may be taken into consideration in determining the fair market value of a property. The Supreme Court settled that question in *Long Beach City H.S. Dist.* v. *Stewart*, 30 Cal.2d 763 [185 P.2d 585, 173 A.L.R. 249], saying among other things (at page 767): ". . . if there is testimony that demonstrates with 'plausibility' a prospective use for purposes other than that to which the land is restricted, the jury might be instructed that if it finds in accordance with defendants' evidence, then

'in view of the supposed changes of conditions, the city council in the exercise of its discretion might modify, as indicated, its zoning ordinance, and that in estimating the market value the jury might consider this possible change of the ordinance and the reasonable influence on market value, of such possibility.' ''

The questions, as put in this case, do not, in our opinion, come within the rule as stated. Mr. Wechsler, the president of B & A Investment Company, Inc., on redirect examination was asked:

''Q. Do you have any opinion as to what the value of the land would be based upon the conversion of all of the land remaining in that parcel to a shopping center?

''MR. DAVIS: Objection, your Honor, incompetent, irrelevant and immaterial, and I think we are interested in what the property would sell for as of March 16, 1955.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

''MR. MAIDMAN: As of March 16, 1955?

''THE COURT: You are cross examining your own witness, Mr. Maidman. . . .

.   .   .   .   .   .   .   .   .   .   .   .   .   .

''. . . What we are concerned with here is the fair market value of the property as of the valuation date, without regard to its value for a specific purpose. The market value takes into consideration all uses and purposes to which the property might be put.

''MR. MAIDMAN: Let me clear that up then, because the reason I asked the question, I didn't understand it myself in that respect.''

The questions were apparently referring to an ultimate possible rezoning of the property, and if they were, the objection as made was proper. (*Redwood City etc. Sch. Dist.* v. *Gregoire, supra.*)

When Mr. Martin, the expert for the appellant, was testifying, the following occurred:

''Q. BY MR. MAIDMAN: Now, insofar as zoning is concerned, Mr. Martin, can you tell us whether you have made any investigation as to the change of zoning, *if such change is desired* in that immediate area?

''A. I don't think I understand you, sir.

''Q. Well, *would there be any difficulty* based upon any examination you made to change any of that zoning from B, for example, to C-2, *if it was desired*?

"MR. DAVIS: I object, your Honor. I don't think we can read the minds of the Planning Commissioner or the City Council of Redondo Beach.

"THE COURT: Sustained." (Emphasis added.)

That question, as put, is speculative and conjectural. In the first question it is evident that it was not at that time even determined "if such change is desired." The next question is "would there be any difficulty" based upon any examination he might have made. The question seems to call for an answer as to what the planning commission might do with some plan which was not yet formulated, and then what the city council might do with it, if the planning commission approved it. ■ If there is to be a showing of a reasonable probability of a change in the zone of a property to be condemned, the evidence must at least be in accordance with the usual minimum evidentiary requirements, and that which is purely speculative, wholly guesswork and conjectural, is not admissible. Martin was called as an expert on values and not on zoning matters, and he made no pretense of qualifying as such an expert. ■ But, assuming for the moment that it was error to sustain the objection to such question, no prejudicial error resulted therefrom. Wechsler, the president of B & A Investment Company, Inc., testified as follows:

"Q. Well, would the present zoning laws have any effect upon your proposed use, or the proposed use of this property?

"A. No, they would not. It is perfectly zoned for this proposed use.

"Q. When you say it is perfectly zoned, would you explain that, please.

"A. Well, as I testified to the other day, the back portion of the property is 'C' and the portion fronting on Inglewood is zoned 'P.' And that is exactly in accord in every way, every new major shopping center which has been developed, that is stores to the back of the property and the parking area to the front of the property."

Martin, on cross-examination, stated:

"A. I think it lays out well for a shopping center development. I don't see any objection to it, or generally speaking, a perfect shopping center location would be around the site so that the shortest distance from the fringe areas to the parking to the main building for walking would be—in other words, there would be no corners sticking out where you'd have to walk a very long distance."

Appellant's contention that the court abused its discretion in limiting it to one expert witness is answered by section 1871, Code of Civil Procedure, which provides in part: "The court or judge may at any time before the trial or during the trial, limit the number of expert witnesses to be called by any party."

█ Appellant put on Wechsler, the president of B & A Investment Company, Inc., as a witness and he appeared to be well informed upon real estate values in the area, and Martin, a qualified real estate appraiser. They each testified as to all of the factors of market value at great length. Appellant has pointed to nothing which could have been brought out by some other witness which was not purely cumulative. The court in its discretion may limit the number of witnesses who may be called upon to testify with reference to a single question, as here, and the court can refuse to receive evidence which is purely cumulative. (Code Civ. Proc., § 2044; *People* v. *Casselman,* 10 Cal.App. 234 [101 P. 693]; *People* v. *Hendrix,* 192 Cal. 441 [221 P. 349]; *City of Daly City* v. *Smith,* 110 Cal.App.2d 524 [243 P.2d 46]; *Laguna Salada etc. Dist.* v. *Pacific Dev. Co.,* 119 Cal.App.2d 470 [259 P.2d 498].)

Coming to appellant's final contention, it is clear from a reading of the entire record that the judgment is supported by the findings, and the findings are supported by the evidence. █ The plaintiff's expert witness testified that the market value of the property was $38,000. The court found the market value to be $45,000. The judge considered the testimony of the various witnesses as to value, which ranged from $38,000 to $113,500, or a difference of $75,500, on two and a fraction acres of bare land. The trial judge viewed the premises himself and had before him several good photographs of the entire property and several maps and plats and determined the market value at $45,000. Furthermore, the court had before it evidence that there was an agreement of some sort between Flodine and the appellant to sell the property in question for $42,500, to be paid out of the subordinated obligations. █ The selling price of the identical property may be taken into consideration in determining market value. (*Bagdasarian* v. *Gragnon,* 31 Cal.2d 744 [192 P.2d 935]; *Eatwell* v. *Beck,* 41 Cal.2d 128, 134 [257 P.2d 643].) It is not the function of the appellate court to reappraise or reweigh the evidence. █ We believe that there was sufficient evidence to support the judgment. (*City*

*of Daly City* v. *Smith, supra,* 110 Cal.App.2d 524; *Redwood City etc. Sch. Dist.* v. *Gregoire, supra.*)

Counsel for the appellant argues that the ruling in *County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d 680] should determine this case. A close reading of the Faus case fails to disclose to us any similarity between the facts of that case and the case at hand, and even if there were such a similarity counsel for the appellant laid no foundation, whatsoever, for any questions which might have been appropriate under the rules laid down in the Faus matter. It was stated by the appellant at the oral argument that the trial court refused it permission to ask any further questions as to the price paid by a condemning body for property closely located to the subject property. The record discloses that when Williams, the plaintiff's expert witness was being cross-examined by counsel for the appellant, some 100 pages from the start of such examination, the following occurred:

". . . You know the widening work has been done on Inglewood Boulevard south of El Segundo?

"A. The only work that's been done in the widening of Inglewood south of El Segundo is at the corner of Rosecrans, which is in connection with the widening of Rosecrans. The work has not commenced south of El Segundo except for the part that they paved with concrete about 100 feet south of El Segundo Boulevard.

"Q. Yes. Now, you are familiar with the acquisition by the County of these strips on the west side and the east side of the street?

"A. Well, I am not familiar with prices they paid, if that's what you mean, but I know there has been a buffer strip there for future widening.

"Q. Well, did you know that they have already purchased those ten and fifteen feet strips for the widening of Inglewood Boulevard and have been paying from eighty cents to a dollar fifteen per square foot?

"A. I told you I didn't know the prices they paid. I knew they were working on it, the County is working on it.

"Q. You didn't know that at all?

"A. I didn't know the prices, no.

"Q. The prices, you didn't check into it?

"A. No. It's not admissible evidence.

"Q. I think the Court is the best judge of that, Mr. Williams.

"A. It's property acquired by a condemning body, not an open market sale.

"Q. Well, it's not subject to any suits. It's a negotiated sale, isn't it?

"A. It certainly is subject to suit. They served the suit on the property owner at the time they notified him of their acquisition.

"Q. They served a notice?

"A. Of suit, yes.

"Q. And you know that they have been making offers to purchase, not going to court, and that they have purchased considerable of this?

"A. And if they don't purchase it, then they will get a couple of fee appraisers and go to court. That's the method.

"THE COURT: It has been held, Mr. Maidman, that the purchase by an entity which has the power to condemn is not an open market sale.

"MR. MAIDMAN: I see."

The statement which the court made, under the circumstances, was a correct statement of what had, up to that time, been held by courts as being the law. There was no ruling made by the court, and he certainly did not refuse counsel the right to proceed with any other questions, and counsel made no pretense of even attempting to lay any foundation for a proper question along the lines indicated in the Faus decision. Furthermore, the witness repeatedly stated he did not know the prices paid by the county for other property acquired by it.

Appellant was obviously in a quandary in that it had to appear to justify a low valuation for the purposes of showing the agreement with the widow as being subject to specific performance, and to the end that it could show a compensable interest in the property, and at the same time, contending for a higher valuation, $113,500, for the purposes of compelling the school district to pay an exorbitant price for the property.

In our opinion the case was fairly tried and properly decided, and there was no prejudicial error.

The judgment is affirmed.

White, P. J., and Drapeau, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 16, 1957.

---

*Assigned by Chairman of Judicial Council.