379 P.2d 750

**STATE of Arizona, Appellant,**

v.

**Frank E. HOLLIS and Eva Marie Hollis, husband and wife, Appellees.**

No. 7391.

Supreme Court of Arizona.

En Banc.

March 14, 1963.

Rehearing Denied April 16, 1963.

Robert W. Pickrell, Atty. Gen., William E. Eubank, Asst. Atty. Gen., John T. Amey, Asst. Atty. Gen., for appellant.

Dunseath, Stubbs, & Burch, Tucson, for appellees.

JENNINGS, Justice.

In November of 1959, the Arizona State Highway Department commenced certain construction and improvements on U. S. Highway 60 near Globe, Arizona. As a result of this construction the roadway was elevated from five to eighteen feet over adjoining property and a drainage ditch was constructed next to the property line. The owners of this property, Frank E. Hollis and Eva Marie Hollis, filed suit in Gila County Superior Court against the State of Arizona to recover damages for impairment of access to their property. Following a jury trial judgment for $85,450 was awarded to plaintiffs Hollis and the State appeals.

A number of assignments of error are presented supported by eight propositions of law. Only one assignment complies in all respects with the rules of this Court. This is that the court erred in denying the State's timely motion for change of venue from Gila County to Maricopa County. The basis of the motion is A.R.S. §§ 12–821 and 12–824(B), which provide as follows:

"§ 12–821.

"Persons having claims on contract or for negligence against the state, which have been disallowed, may on the terms and conditions set forth in this article, bring action thereon against the state and prosecute the action to final judgment.

"§ 12–824.

"B. Upon written demand of the attorney general, made at or before the time of answering, served upon the opposing party and filed with the court where the action is pending, the place of trial of any such action shall be changed to Maricopa County."

Paragraph I of the amended complaint alleges that the State had agreed the highway would be constructed at grade and that the property concerned would have an unrestricted access to Highway 60. Paragraph III of the amended complaint alleges acts of trespass by the contractor who was performing the construction for the State whereby the plaintiff's property sustained damage. It is claimed therefrom that venue should be in Maricopa County in accordance with the State's demand because the complaint sounds in contract and tort.

The remainder of the complaint alleges that the State, without instituting

condemnation proceedings, appropriated the plaintiffs' access rights to their property and otherwise damaged the property by the acts of its agent. The complaint therefore states a cause of action on the theory of inverse eminent domain. Destruction and impairment by the State of ingress or egress to private property is compensable under Article 2, section 17 of the Arizona Constitution, A.R.S. Pima County v. Bilby, 87 Ariz. 366, 351 P.2d 647 (1960); Fletcher v. State ex rel. Morrison, 90 Ariz. 251, 367 P.2d 272 (1961). The authority for such an action comes directly from the Constitution. It is neither an action in contract nor one in negligence as provided by A.R.S. §§ 12–821 to 12–826, and the procedures required therein do not apply. State v. Leeson Upholstry, 84 Ariz. 44, 323 P.2d 692 (1958). The right of the State to remove a case to Maricopa County under section 12–824 (B) is limited to the actions authorized by section 12–821.

A.R.S. § 12–1116 provides that actions for condemnation shall be brought in the superior court in the county in which the property is located. That the landowner, in default of proper condemnation action by the State, must himself institute proceedings to secure compensation does not change the essential nature of the cause of action. It is still in the nature of a condemnation of a private property right by the State under the sovereign right of eminent domain. The property involved is located in Gila County and the action was properly brought in that county.

The remaining assignments of error unfortunately fail to meet with the requirements of the Supreme Court rules. Most of them do not specify the particular ruling or action which is complained of and therefore cannot be considered. Tidwell v. Riggs, 70 Ariz. 417, 222 P.2d 795 (1950); Rules of Supreme Court 5(c), 17 A.R.S.

Those assignments which do point out the ruling of the court are defective in that the ground of error is not stated. Thornburg v. Frye, 44 Ariz. 282, 36. P.2d 548 (1934); Rules of Supreme Court 5(c). Insufficient assignments are not cured by reference to the argument or other portions of the brief, for, if it be necessary to do this to ascertain the error complained of, the brief does not comply with the rule requiring assignments of error. Reid v. Van Winkle, 31 Ariz. 267, 252 P. 189 (1927).

It is our conclusion however, that one of the assignments when examined in conjunction with the propositions of law is specific enough to identify the principal ground of complaint. United Ass'n of Journeymen and Apprentices etc. v. Marchese, 81 Ariz. 162, 302 P.2d 930 (1956). It concerns the admission and consideration of a lease on part of the property and was the basis for the expert testimony as to damages.

The Hollis property consists of 23 acres located two to two and one-half miles from Globe. There was 1980.4 feet of frontage with a maximum depth of 730 feet. The property was located three-quarters of a mile from the junction of U. S. 60 and 70 going into Globe. The grade of the highway before the construction of the controlled access highway was about 21 inches. After the construction the grade varied along the front footage from 8 feet to 17 feet.

In March 1957 Hollis entered into a 99-year lease with one Schwarz covering the front footage consisting of 7.9 acres. The lease provided for periodic increases in the rental and Schwarz intended to develop the front footage commercially. The Schwarz lease continued in effect until May 1958. At about that time it was allowed to lapse. The remainder of the acreage was intended by Hollis for a drive-in theater and to this end he had development plans prepared and obtained bids on theater equipment. This was prior to the time of the taking, which was fixed as November 25, 1959. Construction was begun August 12, 1959. The property is the first level ground for a seven-mile stretch of highway coming into Globe. The surrounding area is hilly and there is little property in the area available for private development.

[8] Expert witnesses for appellee testified as to their opinion of the market value of the property. They valued the property in two parts, i. e., the front footage covered by the lease and the back acreage. Together with other elements, they considered the Schwarz lease as a factor in arriving at their opinions of the front footage. It was admitted over objection for the stated purpose of showing the highest and best use of the area covered. Appellant attacks admission of the Schwarz lease on the ground that plaintiffs cannot recover for loss of profits or business loss. It is clear that there is confusion over what constitutes business income. Income from a business must be distinguished from income from the intrinsic nature of the property itself. If the property is rented for the use to which it is best adapted, the actual rent received, capitalized at the rate which local custom adopts for the purpose, forms one of the best tests of value and, accordingly, evidence of rent actually received at a time reasonably near the time of taking should be admitted. County of Maricopa v. Shell Oil Co., 84 Ariz. 325, 327 P.2d 1005 (1958); 4 Nichols, Eminent Domain §§ 12–312, 12–3122 (3d ed. 1951). When offered by the owner the rental is assumed to be what he contends is the best available use. County of Maricopa v. Shell Oil Co., supra; People ex rel. Department of Public Works v. Dunn, 46 Cal.2d 639, 297 P.2d 964 (1956) (Where it was held prejudicial error to strike from the evidence and withdraw from the jury consideration of testimony of value

based on a lease on the property); Kelchner v. Kansas City, 86 Kan. 762, 121 P. 915 (1912).

The Kelchner case states a sound reason for the rule as follows:

"Witnesses were permitted to testify to the amount of rents received by the owner from the property taken, and this ruling is alleged to be erroneous. It is true that the market value of the property is the measure of damages for the appropriation, but evidence of market value is not necessarily restricted to direct answers to the particular question, 'What is the market value?' Rentals received in good faith necessarily affect values and in common transactions are considered by intending purchasers with other elements in estimating market value. No good reason is perceived why a jury should not have the benefit of such information. The witnesses should be allowed to state any fact concerning the property which will fairly aid in arriving at its market value, and income received in good faith from the ordinary use of the property within a reasonable limit of time is clearly one of the facts naturally contributing to that end, excluding, however, anything fanciful or fictitious." 86 Kan. at 763, 121 P. at 915–16.

■ The argument reflects the idea that the lease is too remote because it was not actually in operation in November 1959, the date of the taking. The relevancy of the lease must be determined under the circumstances of each case, and should be left to the discretion of the court unless a clear abuse is shown. There is no showing that the lease was not entered into in good faith or that its termination was not in accord with the hereinafter described testimony.

■ There was evidence from which the jury could believe the lease would have been in effect if it were not for the construction.

Hollis testified as follows:

"Q When did this lease terminate?

"A One year—he kept the lease in effect for one full year, and at the end of one year when the terms went to $200.00 a month he and I talked about it and at that time we decided that until the road was completed, or almost, to where he could develop it, that we wouldn't exercise the lease any more, but that he would, after it was constructed he could come back and pick up the lease. He would get first choice.

"Q And at the time you terminated the lease by mutual consent, were you informed at that time by any

of the State Highway Department officials generally what the department was going to do, and ultimately did, as far as the road in front of your property was concerned?

"A Yes.

"MR. EUBANK: Object to the leading questions, if the Court please.

"THE COURT: Sustained.

"Q What information at the time the lease was terminated did both you and Mr. Schwarz have as to what the State was going to do concerning the construction of the highway in front of your property?

"A The right of way department had talked about it, and it was my understanding that they were going to raise the roadbed, and at that time they couldn't give me any definite figures but we felt it was going to be raised considerably because they informed us to that effect."

It is competent to show the value of property as it would have been if no such highway construction had been contemplated. In other words, the property cannot be charged with a lesser value at the time of taking when the decrease in such value is occasioned by reason of the taking itself.

In re South Twelfth Street, 217 Pa. 362, 366, 66 A. 568 (1907); 4 Nichols, Eminent Domain § 12–3151(2) (3d ed. 1951); 1 Orgel, Eminent Domain § 105 (2d ed. 1953).

" * * * The impairment of value resulted from nothing he had done, but as the immediate consequence of the steps taken by the municipality towards the appropriation, in invitum, of the owner's land. In the present case it is quite clear that without the right to build upon the land, this narrow strip, 60 feet wide, located as it is, would be of little, if any, value. This, then, is the contention, that the municipality in the furtherance of public ends, having stripped the land of nearly its entire value, now, when it seeks to accomplish fully its purposes in connection therewith, is to be allowed to acquire the land by paying a sum measured by the little value the municipality has left in it. Such a result would be a travesty on the constitutional provision which requires in all such cases just compensation to be made for the property taken." 217 Pa. at 366, 66 A. at 569.

█ Plaintiffs were entitled to show the use for which the property was adapted was that of lease for commercial development and the evidence that it had been so leased prior to the taking was within the range of discretion of the trial court. The

testimony of the experts based on the Hollis lease was properly admitted and justifies the verdict and supports the damages.

Judgment affirmed.

BERNSTEIN, C. J., and STRUCK-MEYER and LOCKWOOD, JJ., concur.

UDALL, Vice Chief Justice (dissenting).

I dissent from the ruling of the majority with regard to their treatment of the Hollis-Schwarz lease.

The State assigns as error the trial court's refusal to grant its request for an "advance ruling prohibiting any reference to a lease without its materiality and relevancy being first established * * *." This is followed by an assignment that the trial court erred "in admitting into evidence plaintiffs' exhibits * * * No. 14 (Hollis-Schwarz Lease)." The two can be considered together and I turn my attention to a discussion of the lease, its lack of materiality, and the error of the trial court in admitting it into evidence.

On March 22, 1957, appellees granted to W. M. and Margaret S. Schwarz a ninety-nine (99) year lease on 7.89 acres of land subject to the dispute in this case. By the terms of the lease the lessees were to pay rental of $50 per month during the first year. During the next three years rent was to be paid at the rate of $200 per month. After that period it was to be raised to $225 per month for the next six years and then to be raised to $450 per month for the remainder of the term of the lease. This lease was not recorded.

The testimony shows that the rental was paid for only ten months (rather than one year) after which the lease was terminated by mutual consent of the contracting parties. In Mr. Schwarz' own words "it was a dead issue" from that time and the higher rentals never were paid. Consequently the lease had earned only $500 for the lessors during a ten-month period.

On August 12, 1959, the State began to work on elevating the grade of the road adjacent to the leased property. This was more than 18 months after the premature termination of the lease by the parties. At the time the lease was terminated and up until the time construction began there was nothing on the ground to apprise the property owners of the change in road elevation or that they would be affected by any alterations on the highway. Upon appellee Frank E. Hollis being asked by his counsel:

"Q   What information at the time the lease was terminated did both you and Mr. Schwarz have as to what the State was going to do concerning the construction of the highway in front of your property?

he replied:

"A   *The right of way department had talked about it, and it was my understanding* that they were going to raise the roadbed, and *at that time they couldn't give me any definite figures but we felt it was going to be raised considerably* because they informed us to that effect." [Emphasis supplied.) [1]

Beyond this there was no reason given for the termination of the valid and enforceable lease entered into by these reputable parties. Thus the evidence shows that the lease was made worthless by the acts of the parties themselves and for reasons known to them alone and not because of the elevation of the roadbed by the State. Had the lessors chosen to do so they could have held the lessees to the full term of the lease and realized its full value.

The majority opinion states "If the property is rented for the use to which it is best adapted, the *actual rent received * * * * forms one of the best tests of value and * * * *   rent actually received* at a time reasonably near the time of taking should be admitted." (Emphasis supplied.) They

quote from the case of Kelchner v. Kansas City, 86 Kan. 762, 121 P. 915 (1912) in which the court permitted evidence of "rentals received" in determining market value. The fallacy in the application of these principles to the situation before us lies in the fact that the only rents ever received were in the sum of $50 per month for only 10 months and no rents were being received at the time of the alleged taking and none had been for 18 months prior thereto. The authorities cited by the majority, County of Maricopa v. Shell Oil Co., 84 Ariz. 325, 327 P.2d 1005 (1958); People ex rel. Department of Public Works v. Dunn, 46 Cal.2d 639, 297 P.2d 964 (1956); and Kelchner v. Kansas City, supra, are not in point because they deal with leases in full force and effect at the time of the taking. But even if the trial court concluded that rents received several months prior to the taking were rents received "at a time reasonably near the time of taking", the rents received in this case were only nominal and the admission of the lease into evidence was misleading to the jury and prejudicial to the rights of the State.

1. The appellees' source for information that "they informed us to that effect" is the grossest type of hearsay. The word "they" is nondescriptive and indicates rumor rather than factual information. That they did not rely on this information is evident from the statement of their attorney:
  "We next take the position that the date of valuation is not August 12th

(1959) because that was the date work was actually begun, and there was nothing out there on the ground to apprise the property owner at that particular time what the finished property was going to look like. * * * the only thing the property owner could do was wait and see what happened * * *."

It seems very significant that at the time of valuation of the property and the time construction on the highway was begun and finished the lease had long since been terminated. The evidence shows that it was not the rent actually received upon which the appraisers determined market value but rather the lease which would have had an ultimate rental value of $450 per month only after the expiration of ten years time from the date the lease was entered into. Such rentals were not received nor never would have been received because the parties had terminated the lease.

The majority cited the case In re South Twelfth Street, 217 Pa. 362, 66 A. 568 (1907) for the proposition that the valuation of the property should have been made as of the time notice of the taking occurred. That case has no application here. Therein the landowner was given actual official notice for a period of 40 years that a street would be built across his land when occasion for the opening of the projected street arose. Here, no official notice of any kind was ever given to the landowners or to the lessees of any action the Highway Department intended to take.

The Hollis-Schwarz lease was admitted into evidence for the purpose of showing the "highest and best use" of the property and was relied upon heavily by each appraiser. The only mention made in the instrument of any use to which land could be put was a negative restriction preventing the lessees from using the leased premises for a motion picture theater. Beyond this there was no use mentioned; and as evidence of a "highest and best use" for rental purposes it was totally incompetent.

The very most the lease could have done was to show speculative value to the property—that is, to show possible future commercial or rental use. It should never have been admitted to show what the owner intended to do with it. In County of Los Angeles v. Bean, 176 Cal.App.2d 521, 1 Cal. Rptr. 464, 468 (1959) it was said:

"Appellant insists that he should have been entitled to show what he intended to do with the property (namely to produce oil therefrom). A proper objection was sustained. It is settled that the use intended by the owner does not enhance the market value of property (cases cited). Actual market value is the measure, and not its value in use to the owner (cases cited)."

See also Redwood City Elementary School District v. Gregoire, 128 Cal.App.2d 766, 276 P.2d 78 (1954).

In Redondo Beach School District of Los Angeles County v. Flodine, 153 Cal.App.2d 437, 314 P.2d 581, 586 (1957) the court said:

"Coming to appellant's next contention apparently appellant intended to subdivide a part of the property in some way or other and ultimately to subdivide all of it, but the usual rule in

eminent domain proceedings is that a proposed plan for the development of the property proposed to be taken is not material on the issue of market value."

Then in People v. La Macchia, 41 Cal.2d 738, 264 P.2d 15 (1953) the California Supreme Court upheld an instruction to a jury which read:

> " * * * 'Whatever purpose the Defendants had in connection with the future use of the property, can add nothing to its market value. The fact that this purpose is defeated by condemnation, however much a disappointment, is not a matter of compensation. * * * Value in use is not to be considered by you as determining the market value of the property. A plan which Defendants may or may not have had for the improvement of the property adds nothing to the market value.' " [2]

Not only should the Hollis-Schwarz lease itself have been withheld from evidence but it has been repeatedly held that expert opinion evidence based on sheer speculation is not competent. Board of Regents of University, etc. v. Cannon, 86 Ariz. 176, 342 P.

2d 207 (1959); State of Washington v. United States, 9 Cir., 214 F.2d 33 (1954). In the case at bar each one of the appraisers who testified as to market value of the Hollis property relied heavily upon the Hollis-Schwarz lease which was no longer operative. To have permitted the appraisers to testify to possible intended uses was error.

The prejudice to appellant by permitting reference to the terminated lease is clearly evident. Edwin Husted testifying on behalf of appellees stated the market value before construction on the road to have been $91,-200.[3] In arriving at this figure he treated the Hollis-Schwarz lease as though it were in existence at the time of his valuation:

> "Q And in arriving at your opinion of the fair market value before the taking did you take that lease into consideration?
>
> "A Yes.
>
> \*    \*    \*    \*    \*    \*
>
> "Q Then you treated the lease—my understanding is that you treated the lease as if it was in existence at the time of valuation?

**2.** 4 Nichols, Eminent Domain, § 12–312, cited by the majority of the court, states in subsection 2:
"A valuation based upon an estimate of the potential income which might be realized from a utilization by the owner of the property in a manner of which it is capable but of which he has not yet availed himself, has been generally rejected on the ground that such income is too uncertain and conjectural to be acceptable."

**3.** This was the highest appraisal outside of Hollis's own estimate. The next highest was $74,400 by Mrs. Oakes.

"A  As if it were in existence?

"Q  Yes.

"A  Is this before or after?

"Q  You stated that you used it in your consideration both in the before and after situations.

"A  Yes.

"Q  Now, were you informed that this lease was in default in May 1958?

"A  I was not.

"Q  And were you advised that the lease was mutually rescinded as of that date?

"A  I don't recall."

Husted valued the property after the raising of the grade of the road to be $5,750. The difference between these two figures was $85,450, the exact amount awarded appellees by the jury.[4] The largest portion of his $91,200 evaluation was on the 7.89 acres for which the lease had been granted. He valued that portion at $79,200.[5] To have considered the lease was prejudicial error of the most fundamental nature.

For the reasons above stated the judgment should be reversed and the cause remanded for a new trial.

4.  The record shows an error in mathematics of $1,000. ($84,450 instead of $85,450).
5.  I note that Husted's figures were calculated at $40 a front foot for 1980 front feet. Hollis himself admitted that only 1680 front feet had been usable before the road work was done and that he did not expect compensation for the additional 300 feet.