327 P.2d 1005

COUNTY OF MARICOPA, a body politic,
Appellant,

v.

SHELL OIL COMPANY, a corporation,
Appellee.

No. 6405.

Supreme Court of Arizona.

July 10, 1958.

Lewis, Roca, Scoville & Beauchamp and Walter Cheifetz, Phoenix, for appellant.

Fennemore, Craig, Allen & McClennen, Phoenix, for appellee.

JOHNSON, Justice.

This was an action in condemnation instituted by the County of Maricopa, appellant, pursuant to § 27–901, A.C.A. 1939.* In 1948 appellee, Shell Oil Company, leased a parcel of land located at the southeast corner of the intersection of East Thomas Road and 24th Street, Maricopa County, Arizona. The lease was for a base term of fifteen years from June 1, 1948, and for an additional five-year term. The lease rental was a flat $150 per month for the first five years, and thereafter $150 per month, plus one cent per gallon for any gallons up to 10,000 delivered during the month in excess of 15,000. The leased parcel was rectangular in shape, and consisted of 127 feet of frontage on East Thomas Road and 100 feet of frontage on 24th Street. The

Shell Oil Company erected a 100 feet by 100 feet service station on the parcel and in so doing did not utilize the east 27 feet of the parcel. The station had two pump islands, one on the Thomas Road side and one on the 24th Street side. The station's lighting system included lights perched on three tall poles located respectively at the northeast, northwest and southwest corners of the station.

The Shell Oil Company subleased the station to a tenant who operated it from July of 1952 until October of 1953. The tenant paid a rental of $150 per month and later $175 per month. During the latter part of October, 1953, the station was subleased to another tenant who since that time has operated the station. The second subtenant paid Shell Oil Company $185 per month rent.

On February 19, 1954, the condemnation action was initiated to obtain additional right-of-way with which to widen East Thomas Road. A right-of-way over the north seven feet of the service station property was obtained.

Prior to the trial a stipulation was entered into whereby it was agreed that the value of the seven-foot strip sought to be condemned was the sum of $2,100 apportioned as damages for the land taken by awarding to the Shell Oil Company the sum of $1168.65 and by awarding to the owner of the fee the sum of $931.35. The owner

* Now A.R.S. § 12–1111.

of the fee claimed no severance damages, and the only issue before the trial court for determination was the amount, if any, to be awarded to the Shell Oil Company for severance or consequential damages to its leasehold estate.

The trial court awarded the Shell Oil Company severance damages in the sum of $10,000. The County of Maricopa has perfected this appeal, and makes the following assignments of error: (1) that the severance damages in the sum of $10,000 is excessive, contrary to the evidence, and contrary to the law; and (2) that the trial court in fixing severance damages failed to adopt the measure of damages which gives the lowest figure.

■■■■ Appellee had the burden of proof in establishing the severance or consequential damages sustained to its leasehold estate as a result of the partial taking of the land. Town of Williams v. Perrin, 70 Ariz. 157, 217 P.2d 918. In Pima County v. De Concini, 79 Ariz. 154, 285 P.2d 609, we laid down the rule that when only a part of the property is taken, the measure of severance damages is the difference between the market value of the property not taken, before and after the taking.

In State ex rel. Morrison v. Carlson, 83 Ariz. 363, 321 P.2d 1025, 1027, we recognized the difficulty of measuring damages where a portion of a leasehold estate is taken in condemnation:

"* * * It is well recognized that leases commonly are not assignable without the consent of the landlord, and are infrequently sold, and vary so much in length of term, rent reserved and other particulars, as well as in the character of the property, that it is impossible to apply the customary test of market value to a leasehold interest. United States v. Petty Motor Co., supra [327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729]; 4 Nichols on Eminent Domain, § 12.42(3), p. 179."

Appellee, in proof of the severance damages, relies on the testimony of a qualified real estate appraiser who testified the fair market value of the leasehold before the condemnation was $41,550 and the fair market value thereof after the taking was $28,112 or a differential of $13,440. The witness's opinion as to the value before the taking was determined by multiplying the average monthly gallonage of 18,363 gallons for the three-year period prior to condemnation by the rental value of $.02 per gallon which produced the product of $367.26, which he rounded out to $365 as the rental value per month. This figure was then multiplied by 12 which produced $4,280 (the correct product was $4,380 which the witness corrected on cross-examination) as the annual rental value. He then multiplied $4280 by 9.4, being the present worth factor, at 6% for fourteen years and three months, the term of the lease, which pro-

duced $41,550. The witness arrived at the fair market value of the leasehold after the taking by applying an estimated 30% judgment factor to the value of $41,588. His testimony in connection with the 30% judgment factor was as follows:

"Q. You mentioned an item of 30% or a factor of 30%; will you explain what you meant by that? A. The 30% is a judgment factor, you just don't reach up and pull something out of the air. We did try to verify it and use judgment on it. It is predicated on several factors, No. 1, immediately after the pole was moved, which was before condemnation by four months— no, by six months—the gallonage of the station dropped about 17 or 18%, from 18,000 to 14,000 five, or 14,000, an average number. We took that into consideration and the position that the service station was placed in with the handicap of ingress egress on 24th Street to their island as well as the fact that to use the outside portion of the Thomas Street island customers would be trespassing on city property.

"Q. As I understand it, in your opinion these things you have just mentioned reduced the desirability and utility of the station by 30%? A. Yes.

"Q. Plus that portion of the property lost by condemnation? A. Yes." On cross-examination the witness stated

his opinion as to the amount of severance damage included the value of the land taken. Nevertheless, his opinion as to the amount of severance damage after deducting the award made for the value of the land taken is in excess of the judgment.

A direct conflict exists in the testimony of the expert witnesses who testified for both parties as to the severance damage to the leasehold estate. Appellant contends, however, that the testimony of appellee's expert witness cannot sustain the judgment for the reason his opinion as to value was based on an erroneous factual premise and an improper method of capitalizing income.

■ The average gallonage of the station for the first three months of 1956 was 11,880 gallons, which was approximately 30% less than the 18,363 gallons per month average for the three-year period preceding the movement of the light pole. The gallonage records also indicate a decline in the average monthly gallonage of 17% for the eight months preceding the movement of the light pole, and a 13% decline in gallonage after the condemnation. Obviously the decline in gallonage of 17% prior to condemnation cannot be charged to appellant. At one point in his testimony the expert witness stated he considered the 30% decline in gallonage as a factor. However, subsequently in his testimony, above quoted, in defining the 30% judgment factor, he used a 17% or 18% decline in gallonage

along with other factors to determine the differential in value before and after the taking. We do not think a variance of 3% or 4% in the decline in gallonage after the condemnation is sufficient to destroy the probative value of the opinion but merely goes to the weight of the evidence. The argument of appellant that the decline in gallonage subsequent to the condemnation may be due to functional obsolescence of the station or to postwar competition, or some other cause, is purely conjectural and without proof thereof does not impair or invalidate the use of such a premise by the expert for his opinion.

The expert witness, as previously pointed out, capitalized the gross rental income as a basis for his opinion of the fair market value of the leasehold prior to the taking. Appellant contends in the actual appraisal process in determining value from income the witness should have capitalized the net income, and cites Nichols on Eminent Domain, Vol. 4, § 12.312(3), at page 75:

"With respect to the actual appraisal process in determining value from income it is the common practice to capitalize the net income. In other words, the value is such sum as will, in accordance with the prevailing local rate of earning, produce annually a sum equivalent to the net annual income. * * "

We are well aware that often in condemnation cases a wide variation will exist in the opinions of experts as to value. We are also aware of the existence of various appraisal processes for the determination of value. As a general rule the courts accede to the view that rental income from property is an element of consideration in arriving at the market value or measure of compensation to be paid for taking property in condemnation proceedings. 65 A. L.R. 455; 134 A.L.R. 1125. Appellant's expert witnesses conceded that the rental income of $.02 per gallon was the fair rental value of the station. The expert witnesses differed, however, as to whether the net or gross rental income should be capitalized. Applying the appraisal process of capitalizing the net rental income we find no great variance in the measure of severance damages as would warrant this court to substitute its judgment for the trial court on the ground the judgment was excessive.

Appellee, in another approach to its proof of damage, introduced evidence to show the cost of relocating the station. Appellant contends such evidence was improper under the rule laid down in the De Concini case:

"The rule also is that in arriving at the market value of land which has been damaged by the exercise of the right of eminent domain the court has a right to admit evidence of possible expenditures which, if expended, would diminish the damages. * * * [T]his class of evidence cannot operate to in-

crease the damages above what they would be without the expenditure."

 Appellee, pursuant to a stipulation, introduced in evidence an estimate of a contractor in the sum of $12,000 as the cost of relocating the station. An engineer for appellee testified in substance that the only way appellee could be made whole or restored as near as possible to its former position would be to relocate the station. The testimony of appellee's expert witness established severance damage of $13,440 less the value of the land taken of $1,168.65, or a net severance damage of $12,271.35. The evidence of possible expenditure of relocating the station at a cost which was less than the severance damages, established by the opinion of appellee's real estate expert, tended to diminish the damages and it was not error for the trial court to consider such evidence.

 There was a direct conflict in the testimony of the witnesses on the questions of the method of providing adequate lighting, the cost of relocating light poles and islands, and possible offset benefits to the service station as a result of the widening. We have repeatedly held that where there is a conflict in the evidence we will not disturb the judgment of the trial court where there is any reasonable evidence to support it. Sturges v. Tongeland, 83 Ariz. 148, 317 P.2d 941.

We therefore hold there was reasonable evidence under the circumstances of this case to sustain the trial court's judgment. Judgment affirmed.

WINDES, PHELPS and STRUCKMEYER, JJ., concur.

UDALL, C. J., dissents.