517 P.2d 1280

STATE of Arizona ex rel. Obed M. LASSEN,
State Land Commissioner, Appellant,

v.

SELF–REALIZATION FELLOWSHIP
CHURCH, Appellee.

No. I CA–CIV 1987.

Court of Appeals of Arizona,
Division 1,
Department B.

Jan. 22, 1974.

Rehearing Denied March 4, 1974.

Review Granted March 26, 1974.

Gary K. Nelson, Atty. Gen. by Peter C. Gulatto, Asst. Atty. Gen., Phoenix, for appellant.

Snell & Wilmer by Bruce Norton, Phoenix, for appellee.

OPINION

JACOBSON, Chief Judge, Division 1.

This appeal raises the issue of whether the State of Arizona can overturn title to state trust lands which have previously been judicially quieted in another on the grounds that the prior judicial tribunal lacked jurisdiction and whether the state can reacquire title by adverse possession through grazing leases and subleases.

In 1964, the appellant, State of Arizona, ex rel. Obed M. Lassen, State Land Commissioner (hereinafter referred to as the State) filed this action seeking to quiet title to certain real property located in Maricopa County, Arizona, described as the north half of the northeast quarter of Section 17, Township 4 north, Range 3 East, G&SRB&M. (The action was not heard until December, 1971.) Upon a stipulation of facts, the trial court entered judgment in favor of the appellee, Self Realization Fellowship Church, finding that a judgment and decree entered in Maricopa County Superior Court on May 15, 1945, was *res judicata* with respect to issue of title and that the State had not thereafter acquired any right, title or interest by way

of adverse possession. The State has appealed from this judgment.

The facts, as stipulated to by the parties reveal the following: The land in question originally belonged to United States of America and was acquired by the State of Arizona pursuant to the provisions of the Arizona Enabling Act, A.R.S., as an indemnity selection on September 5, 1918.

During the period of 1918 to 1927, taxes were levied and assessed against the property for Verde River Irrigation & Power District assessments only. From 1928 to 1943, real property taxes for Verde River Irrigation & Power District assessments were separately levied against this property. In 1939, the treasurer of Maricopa County sold the property to the State of Arizona for delinquent taxes for the years 1933 to 1937 inclusive. The property was again sold for taxes to the State of Arizona in 1942 for taxes assessed during the years 1938 through 1940. Treasurer's Certificates of Purchase were issued in connection with both sales. Pursuant to these Certificates of Purchase, on March 28, 1944, the Maricopa County treasurer executed and delivered to the State of Arizona a Treasurer's Deed to the property sold at the prior tax sales.

Thereafter, pursuant to ACA § 73–838 (1939), the Board of Supervisors of Maricopa County prepared a list of the real property held by the State of Arizona by tax deed and offered the same for private sale. Included within this list was the real property involved in this litigation. In accordance with applicable law, the property was sold to Thomas F. Galloway, as the highest bidder at the sale.

On November 15, 1944, Thomas F. Galloway filed a complaint in Maricopa County Superior Court seeking to quiet title to the real property involved. Named as defendants in that action were the State of Arizona and the County of Maricopa, both of which filed answers to the complaint. On May 14, 1945, the Maricopa County Superior Court entered judgment quieting title in the property to Mr. Galloway, free and clear of any right, title or interest of the defendants, including the State of Arizona. The State timely perfected an appeal of this judgment but the same was voluntarily dismissed by an assistant attorney general. The May 15, 1945 judgment thus became final. The stipulation of facts does not show that any fraud was alleged either in the obtaining of the 1945 judgment or in the voluntary dismissal of the appeal of that judgment.

On June 30, 1952, Thomas F. Galloway conveyed the property in question to appellee which has since that time paid the real property taxes due thereon.

The property is unfenced, unimproved desert land without well water and had never been planted or cultivated. It appears that the State Land Department has issued grazing leases on this property since 1919 and has continued to do so even after the 1945 judgment quieting title to appellee's predecessor in interest. Under the grazing leases and subleases issued by the State's lessees, sheep have grazed on this property when feed was available. Apparently feed is not available each year, but when available the grazing operations last only three or four months during the year. The last such lessee has so used the property from 1951 to the time of filing suit, a period in excess of ten years.

The issues before this Court are the same as before the trial court, being:

(1) Is the May, 1945 judgment *res judicata* as to the State's interest in this property, and

(2) If *res judicata*, has the state reacquired title by adverse possession through its lessees and sublessees?

The State's contention as to the first issue is that the Maricopa County Superior Court lacked "jurisdiction" to enter the May 14, 1945 judgment and thus no *res judicata* effect can be given to that "void" judgment. In making this argument, the State concedes that the general rule is that a judgment is not void on its face and hence subject to attack unless one of three elements are lacking, these being (1) juris-

diction of the subject matter, (2) jurisdiction of the person, and (3) jurisdiction to enter the particular judgment or order entered. *See,* Hughes v. Industrial Commission, 69 Ariz. 193, 211 P.2d 463 (1949).

The State argues both lack of subject matter jurisdiction and lack of jurisdiction to enter the particular judgment entered, it conceding the trial court in 1945 had proper personal jurisdiction. In urging lack of subject matter jurisdiction, the State is in somewhat of a dilemma, for it is arguing that the court in 1945 lacked jurisdiction to do what in 1964 it is asking the same court to do—quiet title to real property located in Maricopa County.

However, this dilemma does serve to place in proper perspective the jurisdictional contention of the state. This contention, reduced to its simplest form, is that the lands acquired by the State of Arizona from the United States of America under the enabling act *are* "trust lands"; that the enabling act placed limitations on the manner of disposing of trust lands; that disposition of trust lands in contravention of these limitations (which admittedly were not complied with here) are void; that the May 14, 1945 judgment could not breathe life into a void disposition, and therefore this judgment is also void as being an act in "excess of the court's jurisdiction." Unfortunately for appellant, the last proposition does not necessarily flow from the preceding propositions.

■ It is clear that the Enabling Act itself contemplated disposition by the State of its trust lands. As was stated in Lassen v. Arizona Highway Dept., 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967):

> "The grant [U.S. land given to the State] was plainly expected to produce a fund, accumulated by sale and use of the trust lands, with which the State could support the public institution designated by the Act. It was not supposed that Arizona would retain all the lands given it for actual use by the beneficiaries; the lands were obviously too extensive and too often inappropriate for the select-

ed purposes. Congress could scarcely have expected, for example, that many of the 8,000,000 acres of its grant 'for the support of the common schools,' all chosen without regard to topography or school needs, would be employed as building sites [footnote omitted]. It intended instead that Arizona would use the general powers of sale and lease given it by the Act to accumulate funds with which it could support its schools." 385 U.S. at 463, 87 S.Ct. at 587.

■ Having given the State the power to divest itself of title to trust lands, did Congress intend to take away from the courts of Arizona the power to determine whether such a disposition was properly made? We believe not. There is nothing in the act itself requiring such result. In fact, the Arizona Constitution which was enacted pursuant to the same Enabling Act that granted the trust lands provides in Article 6, Section 6, A.R.S. thereof, that:

> "The superior court shall have original jurisdiction in all cases of equity and in all cases at law which involve the title to, or the possession of, real property . . . . ."

■ It is thus clear that both in 1945 and in 1964 when the jurisdiction of the Maricopa County Superior Court was invoked, it had jurisdiction (both over the subject matter and to enter the judgment entered) to determine whether the sale of this property to appellee's predecessor in interest complied with the applicable provisions of the Enabling Act. That in 1945, the superior court may have determined this issue incorrectly is of no moment as far as the effects of *res judicata* are concerned. Secrist v. State, 2 Ariz.App. 240, 407 P.2d 781 (1965). Nor is the fact, if it be a fact, that the effects of the Enabling Act were not argued to the Court in 1945 a hindrance to invoking the doctrine of *res judicata.* It is the uncontradicted rule in Arizona that a judgment is not only *res judicata* as to every issue decided therein, but is also *res judicata* as to any issue raised by the record. Taylor v. Betts, 59

Ariz. 172, 124 P.2d 764 (1942); Miller v. Kearnes, 45 Ariz. 548, 46 P.2d 638 (1935); Fischer v. Hammons, 32 Ariz. 423, 259 P. 676 (1927).

In summary then, the language of the Enabling Act may make a conveyance of trust land in contravention of the Act void, but it does not affect judicial determinations erroneously holding that the state has legally divested itself of title to those trust lands.

In this regard the dissenting opinion misconstrues the holding of the majority in this case. Judge Eubank, in his dissenting opinion poses two questions:

"Can title to the 'trust' lands be conveyed or transferred from the trust in any manner other than that expressly authorized by the Enabling Act . . . and Article X of the Arizona Constitution, 1 A.R.S.?" And, "can title to the 'trust' lands be transferred by the failure of state officers to perform their express duties under the Enabling Act, the Arizona Constitution and Statutes?"

Judge Eubank answers both of these questions in the negative and states the majority opinion would answer them in the affirmative. The majority of this court disavows such an interpretation of their position. The majority would, in the abstract, also answer both these questions in the negative. These questions, however, are not the questions before the court. The proper question is: "Does a superior court of this state have jurisdiction to determine the questions posed by Judge Eubank?"

The majority answer is that the court of general jurisdiction of this state and only such a court, has such jurisdiction, and that court having given its answer, although erroneously, is entitled to have its decisions honored under the doctrine of *res judicata*.

We therefore hold that the May 14, 1945 final judgment determining that the State had no right, title or interest in the subject property is *res judicata* and the state may not relitigate this issue.

The State next contends that it has reacquired title to this land by the intermittent grazing of sheep on the land by its lessees and sublessees. The State points to no other act of open dominion by it on the land. We believe this case is controlled by the Arizona Supreme Court decision of England v. Ally Ong Hing, 105 Ariz. 65, 459 P.2d 498 (1969) which quoted with approval from the case of De Las Fuentes v. Macdonell, 85 Tex. 132, 20 S.W. 43 (1892):

"'Uninclosed [sic] land, in this state, has ever been treated as commons for grazing purposes; and hence the mere holding of livestock upon it has not been deemed such exclusive occupancy as to constitute adverse possession. There must be an "actual occupation of such nature and notoriety as the owner may be presumed to know that there is a possession of the land" * * * "otherwise, a man may be disseised without his knowledge, and the statute of limitations run against him, while he has no ground to believe that his seizure has been interrupted".'" 105 Ariz. at 69, 459 P.2d at 502.

The court went on to hold:

"[T]he mere grazing of cattle, absent any other acts of dominion over the land, will not support a claim to land based on adverse possession [footnote omitted]." Id.

The State contends, however, that adverse possession may be acquired by the State engaging in "typical land management", citing the case of Johnson v. State, 245 Or. 618, 418 P.2d 509, 423 P.2d 964 (1966). However, the stipulated facts in this matter do not reveal what "typical land management" the State engaged in so as to bring this case into play. The only "land management" reflected in the stipulated facts is that the State issued grazing leases on the property. If we hold this is sufficient, we would be saying that a person claiming adverse possession through a lessee can acquire more rights than a person who does the same acts without a les-

see. To state the proposition is to show its fallaciousness.

We hold that the State has failed to prove a claim for adverse possession.

The judgment of the trial court is therefore affirmed.

HAIRE, P. J., concurs.

EUBANK, Judge (dissenting).

The majority uses conventional legal principles to dispose of the title issue in this appeal. If the law were that well settled, I would have no qualms in joining them in affirming the judgment of the trial court. However, the law is not settled and the exact nature of the title interest granted Arizona by Congress in the "trust" lands at statehood, has never been fully settled by the courts. In a recent judicial exercise defining one aspect of the "trust" land title, the U.S. Supreme Court acknowledged the problem in these terms:

"The *issues here stem chiefly from ambiguities in the grant itself.* The terms under which the United States provided these lands were included in the New Mexico-Arizona Enabling Act. 36 Stat. 557. *The Act* described with particularity the disposition Arizona may make of the lands and of the funds derived from them, but it *does not directly refer to the conditions or consequences of the use by the State itself of the trust lands for purposes not designated in the grant.* Of the issues which may arise from the Act's silence, we need now reach only two: first, whether Arizona is permitted to obtain trust lands for such uses without first satisfying the Act's restrictions on disposition of the land; and second, what standard of compensation Arizona must employ to recompense the trust for the land it uses. Both issues require consideration of the Act's language and history." (Emphasis

added). Lassen v. Arizona ex rel. Arizona Highway Dept., 385 U.S. 458, 461, 87 S.Ct. 584, 586, 17 L.Ed.2d 515, 518, (1967).[1]

In Lassen, the Supreme Court, noting the extreme care exercised by Congress to "guarantee, by preventing particular abuses through the prohibition of specific practices, that the trust received appropriate compensation for trust lands",[2] held that Arizona was excluded from the express public notice and sale restriction imposed on the trust lands where trust lands were to be used for state purposes, and where the trust received full compensation for the lands transferred from it to the state.

This instant appeal raises yet another aspect of the "trust" title question: Can title to the "trust" lands be conveyed or transferred from the trust in any manner other than that expressly authorized by the Enabling Act, supra, and Article X of the Arizona Constitution, 1 A.R.S.? My answer to this question is: No, while the majority answer is in the affirmative.

The facts of the case at bar show a catalogue of administrative nonfeasance and malfeasance regarding the "trust" lands involved herein, and a transfer or recognition of the transfer of title to those lands in direct violation of the express terms of the "trust". Can we say that title to the "trust" lands can be conveyed out of the back door of the "trust" when it could not be conveyed out of the front door of the "trust"? To state it another way, can title to the "trust" lands be transferred by the failure of state officers to perform their express duties under the Enabling Act, the Arizona Constitution and Statutes? Again, I would answer these questions in the negative, while the majority would answer them in the affirmative.

One basis for my answer is that in my opinion the Arizona Courts lack jurisdic-

---

1. *See also* State ex rel. Arizona Highway Dept. v. Lassen, 99 Ariz. 161, 407 P.2d 747 (1965), rev'd 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967) ; State ex rel. Arizona

Highway Dept. v. Lassen, 102 Ariz. 318, 428 P.2d 996 (1967).

2. 385 U.S. at 464, 87 S.Ct at 587, 17 L.Ed. 2d at 520 (1967).

tion to recognize title to the "trust" lands in any other context than full and sufficient compliance with the "trust" of the Enabling Act requirements. These "trust" land provisions are as much a part of the organic law of the State of Arizona as is the judicial branch of the government itself. Compare: Article VI and Article X, Arizona Constitution, 1 A.R.S. In some respects, the "trust" rises to a higher level than the Arizona judicial branch because the Enabling Act, supra, is the supreme law (U.S. Constitution, Article VI; Arizona Constitution, Article II, § 3, 1 A.R.S.) which we must recognize and apply to cases before us. How then can the Arizona courts recognize title to the "trust" lands in the case at bar in the appellee when the Act of Congress and the Arizona Constitution require a differant result? My answer is that we can't. *See* Murphy v. State, 65 Ariz. 338, 181 P.2d 336 (1947).

Another basis for my dissent and my answer is that the questions raised here are really federal questions of public land law which must be answered in that context.[3] Throughout our history the U.S. Supreme Court has been extremely protective of the public "trust" lands and has said:

> ". . . As a general rule laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest . . . . A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or remove a cloud from it." Utah Power and Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791, 818 (1917).

The necessity for such a statement is understandable within the framework of the history of land-grab schemes that plagued the administration of the U.S. public lands over the years. *See* Lassen v. Arizona ex rel. Arizona Highway Dept., supra. Here, in my opinion, the federal land law would not recognize title of the "trust" lands in the appellee based upon the facts of this case, since to do so completely frustrates the purposes and intention of Congress as expressed in the Enabling Act. *See* Murphy v. State, supra.

A third basis for my dissent and answer is that even though a financial hardship would result to the appellee from an adverse ruling in this case, it cannot be contended that the appellee or his predecessor did not have constructive notice of the "trust" nature of the land since the land was an indemnity selection by the state under clear list No. 9, dated September 5, 1918, pursuant to the provisions of the Enabling Act and a matter of record in the respective federal and state land offices.

Finally, although not raised by either party, the stipulation of facts does not stipulate compliance with A.C.A. § 11–106 (1939), which required that the State Land Commissioner be joined and personally served in an action involving the "trust" lands. I can find nothing in the record to indicate that this was done. To the contrary, the stipulation of facts indicates that the Commissioner was unaware of the activities of the Attorney General in 1945 since the Land Department continued to lease the land in question from 1919 up to the filing of this action in 1964.

---

3. Congress has amended the Enabling Act at least seven times with respect to its land restriction provisions. See Appendix C, S.Rep.

No.194, 82nd Congress, 1st Session 7 (1951) ; and Act of June 2, 1951, ch. 120, 65 Stat. 51.