579 P.2d 590

**CITY OF SCOTTSDALE, a Municipal Corporation, Appellant,**

v.

**ELLER OUTDOOR ADVERTISING COMPANY OF ARIZONA, INC., Appellee.**

**No. 1 CA–CIV 3084.**

Court of Appeals of Arizona,
Division 1,
Department B.

May 4, 1978.

Patrick E. Burke, Asst. City Atty., Richard R. Filler, Scottsdale City Atty., Scottsdale, for appellant.

Snell & Wilmer by Guy G. Gelbron, Ted J. Thayer, Charles K. Ayers, Phoenix, for appellee.

## OPINION

JACOBSON, Judge.

This appeal calls into question the type of damages recoverable for the removal of outdoor advertising signs and the proper methodology for ascertaining those damages under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.*

This action was instituted by the appellant, City of Scottsdale, a municipal corporation (Scottsdale), seeking to determine the amount of damages to be paid appellee, Eller Outdoor Advertising Company of Arizona (Eller), caused by the forced removal of six outdoor advertising poster panels (billboards) from property acquired by Scottsdale for urban renewal purposes. The jury returned a verdict awarding Eller the sum of $15,600 as damages for the taking and $31,400 for "severance" damages. Scottsdale has appealed.

In order to adequately understand the procedural posture of the present litigation it is necessary to refer to a prior lawsuit between Eller and Scottsdale. In 1971, as part of a federally funded redevelopment program, Scottsdale acquired the real property upon which Eller had erected six billboards pursuant to a lease with the prior owner.

Eller's lease provided that ". . . in the event the property is sold . . . you [Eller] will remove your signs upon thirty days written notice from me, accom-

panied by unearned rental." The original term of the lease was for three years but at the time of the acquisition by Scottsdale, the term had been reduced to a year to year tenancy. Pursuant to the lease, Scottsdale notified Eller to remove its billboards. Eller refused. After extended negotiations, Eller instituted an action in Maricopa County Superior Court,[1] seeking to enjoin Scottsdale from removing Eller's billboards or interfering with its occupancy of the property. This suit alleged that Scottsdale's attempt to remove the billboards without payment of just compensation violated the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* (1970).

This prior action was tried to the court, without a jury, and upon findings of fact and conclusions of law, Scottsdale was enjoined from removing Eller's property without payment of compensation. Among the conclusions of law pertinent here, the court found:

"2. That the Uniform Relocation Assistance & Real Property Acquisition Policies Act of 1970 [citation omitted] is applicable to the defendant CITY OF SCOTTSDALE by virtue of defendant's compliance assurances contained in its City Council Resolution No. 868.

\* \* \* \* \* \*

"4. That Section 302 of the [Uniform Act] provides that defendant CITY OF SCOTTSDALE since it purchased the property and required removal of plaintiff's outdoor advertising structure, must also acquire plaintiff's structure, notwithstanding the right or obligation of plaintiff to remove its structure at the expiration of its term, and in acquiring the structure must pay to plaintiff either the fair market value of the structure or the fair market value which said structure contributes to the fair market value of the real property, whichever is the greater.

"5. That Section 302 of the [Uniform Act] provides that plaintiff's outdoor advertising structures shall be deemed to be a part of the real property to be acquired and hence requires defendant CITY OF SCOTTSDALE to comply to the greatest extent practicable under state law, with the acquisition practices and policies set forth in Sections 301(1) through 301(9) [of the Uniform Act].

\* \* \* \* \* \*

"8. That plaintiff ELLER OUTDOOR ADVERTISING COMPANY OF ARIZONA is entitled to possession of the property until defendant CITY OF SCOTTSDALE pays the agreed purchase price for the structures or deposits with the proper court, for the benefit of the plaintiff, an amount not less than the defendant's approved appraisal of the fair market value of the outdoor advertising structure or the amount of the award of compensation in the condemnation proceeding for such structure."

No appeal was taken from this judgment and it became final. On November 21, 1973, Scottsdale filed this action as a "complaint in condemnation," seeking the immediate possession of the billboards and their removal, an order determining the amount of compensation to be paid to Eller, and a determination of the reasonable rental of the property to be paid by Eller and to be used as a setoff against compensation. The billboards in question were located within the city limits of Scottsdale on the south side of McDowell Road, one of the primary east-west streets between Phoenix and Scottsdale. Prior to the taking of the six billboards (the parties stipulated that November 21, 1973 was the date of taking and valuation date) Eller owned a total of thirty-three billboards in Scottsdale. A Scottsdale ordinance prohibits the erection of new outdoor advertising structures such as the ones in question. This ordinance provides, however, that existing billboards are valid non-conforming uses, but once removed or

---

1. *Eller Outdoor Advertising Company of Arizona v. City of Scottsdale*, No. C–269251 (Superior Court of Maricopa County, June 29, 1973).

destroyed, cannot be replaced within Scottsdale city limits.

Eller's billboards are not utilized singularly by advertisers, but are utilized as part of "showings" whereby the same advertisement is displayed at the same time on a number of billboards at various locations throughout the greater Phoenix metropolitan area, including Scottsdale. Each billboard in the Eller system is assigned a Daily Effective Circulation factor (D.E.C.) which is simply a determination, based upon traffic patterns, as to the average number of persons who can be expected to see the particular billboard within a specific time frame. Based upon this factor, Eller is able to assure a potential advertiser that a certain percentage of the population in a given market area will see the ad. This is expressed as a designated number showing. Thus, a number 25 showing means that a particular ad placed on certain billboards at various locations in the market area will be seen by approximately 25% of the total market population during a specified time.

At the time of trial, the primary opinion evidence concerning the fair market value of the billboards taken was offered by two experts—one employed by Scottsdale and one employed by Eller. Eller's expert developed a method of appraisal which he called a market-income approach to value. He first determined that billboards did not normally sell individually or in groups as small as six, and therefore, there was no comparable sales data. He did determine, however, that there had been 13 sales of entire outdoor advertising systems. (In all of these sales, Combined Communications Company, Eller's parent company, was the purchaser.) He determined that four of these were comparable to Eller's greater metropolitan Phoenix area operation.[2] He then took the sales price of these systems (which price included items other than billboards, such as buildings, rolling stock inventories, etc.) and divided that by the net income (gross income less agency commissions and discounts) of these companies to arrive at what the expert designated as a "net income multiplier," that is, the relationship between income and market value.[3]

Taking the average net income multiplier of the four comparable sales, he determined that the fair market value of a billboard was 2.16 times the income generated by that billboard. The expert then determined that a No. 25 showing was the common denominator for the sale of outdoor advertising by Eller in the Phoenix metropolitan area. Based upon Eller's income figures, he then determined that Eller received an average of $15,671 for each No. 25 showing. Using the D.E.C. factor for the particular billboards in question, he determined that each illuminated poster panel (four involved here) contributed to 8½ percent of the total average income for a No. 25 showing. Thus, each illuminated panel generated $1,332 in income. Multiplying this figure by the net income multiplier (2.16) he determined that each poster panel had a fair market value of $2,877. The same procedure was utilized on the two unilluminated panels, arriving at a fair market value of $2,030 per panel. His opinion as to the total fair market value of the six poster panels taken was $15,600.

Eller objected to the opinion of Scottsdale's expert, a real estate appraiser, on the grounds that his opinion concerning the depreciated reproduction costs of the structures was based upon hearsay. Because he was unfamiliar with the reproduction costs of billboards, Scottsdale's expert had contacted a specialist in sign appraisals. This individual supplied the expert with a schedule developed by auditors for both state and federal agencies and billboard companies dealing with the cost of materials involved in billboard structures. The expert then personally reviewed the audit procedures

2. Although Eller also does business in Pima County (Tucson), the expert considered its greater Phoenix operation to be a salable component of the entire system.

3. The assumption is that if the entire income available to an outdoor advertising company comes from poster panel ads, then these poster panels must have a market value based upon the sales price of the entire system.

utilized in determining that the schedule represented costs formulas for standard poster panels. In this expert's opinion, these schedules were more reasonable than the actual cost of production.

The trial court sustained Eller's objection and Scottsdale's expert was not allowed to give his opinion as to the fair market value based upon reproduction cost less depreciation. Consequently, the trial court granted a directed verdict for $15,600 as the fair market value of the billboards—the valuation presented by Eller's expert.

Eller's expert, over objection, was also allowed to testify as to the "severance" damages suffered by Eller as the result of the loss of these six poster panels. The basis of the "severance" damages in the expert's opinion, was Scottsdale's sign ordinance which prohibited the relocation of these signs within the city limits of Scottsdale. Based upon population, average income, home evaluation and Scottsdale's position in the tourist and retail trade, this expert testified that seven percent of Eller's entire Phoenix metropolitan income was generated by the 33 billboards located in Scottsdale. (Eller had approximately 3,247 billboards located in the Phoenix metropolitan area.) Taking the average yearly income of Eller, he then determined that each billboard in Scottsdale had an average income of $3,623. This figure, multiplied by the net income multiplier of 2.16 multiplied by the number of signs taken less the fair market value of these signs resulted in total "severance" damages of $31,400. Scottsdale has raised three contentions on appeal:

1. That, as a matter of law, Eller is not entitled to severance damages, but if severance damages are collectible, the testimony in this case was too speculative to form the basis of those damages;

2. That Eller's expert's approach to fair market value, based upon income, awarded Eller loss of business profits, which are by law noncompensible; and,

3. That the trial court erred in striking Scottsdale's expert's testimony on the grounds of hearsay.

## SEVERANCE DAMAGES

Initially, in order to place the issue of "severance" damages in proper perspective, it is necessary to analyze the effect of the prior judgment in this case.

In its reply brief, Scottsdale contends for the first time that the prior judgment, upon which its condemnation action is based, is void and not entitled to res judicata effect. Eller argues that the prior judgment held as a matter of law that the billboards themselves were real property. In our opinion, both contentions are incorrect.

■ Scottsdale alleges that the prior judgment is void because the trial court erred as a matter of law in determining: (1) that Eller had a right to compensation and (2) that the billboards were real property. However, the trial court had jurisdiction over the parties and subject matter— Eller's right to injunctive relief and compensation prior to removal of its billboards. Having both subject matter and personal jurisdiction, its judgment is not void, even if it were erroneous. *Walker v. Davies*, 113 Ariz. 233, 550 P.2d 230 (1976); *State ex. rel. Lassen v. Self-Realization Fellowship Church*, 21 Ariz.App. 233, 517 P.2d 1280 (1974).

■ We therefore conclude that the trial court in the prior litigation had jurisdiction to prevent Scottsdale from removing Eller's billboards without the payment of compensation required by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* (1970). That judgment having become final is res judicata as to this issue.

However, we are not convinced that this prior judgment intended to hold or did hold that the billboards themselves were in fact real property. As previously indicated, the judgment in the prior litigation determined that the Uniform Relocation and Assistance Act applied to Scottsdale's acquisition of the underlying real property upon which Eller had erected its billboards. 42 U.S.C. § 4652 of that act provides in part:

"(a) Notwithstanding any other provision of law, if the head of a Federal agency acquires any interest in real property in any State, he shall acquire at least an equal interest in all . . . structures . . . located upon the real property so acquired . . . .

"(b)(1). For the purpose of determining the just compensation to be paid for any . . . structure . . . required to be acquired by subsection (a) of this section, such . . . structure . . . *shall be deemed to be a part of the real property to be acquired* notwithstanding the right or obligation of the tenant, as against the owner of any other interest in the real property, to remove such . . . structure . . . at the expiration of his term . . . ." (emphasis added)

In compliance with the terms of the act, the prior judgment provided that "plaintiff's outdoor advertising structure shall be deemed to be part of the real property" and thus Scottsdale was required to "comply to the greatest extent practicable under state law" with the provisions of the Uniform Federal Act.

It is clear, however, that the lease between Eller and the landowner intended that the billboards themselves would remain Eller's personal property and not become fixtures and part of the realty. The pertinent lease language is "[Eller] shall remain the owner of all signs and improvements placed by [Eller] on the property and have the right to remove them at any time."

■ In our opinion, neither the federal act nor the prior judgment meant to change this legal status of Eller's ownership of the billboards themselves from that of the personal property interest to that of an interest in real estate.[4] Rather, 42 U.S.C. § 4652, was meant to accomplish two purposes which prior to its adoption depended upon whether the tenant's structure was a fixture:[5] (1) to allow a tenant to collect compensation for removable structures on real property regardless of their status as a fixture or the terms of the underlying lease. *United States v. 40.00 Acres of Land, More or Less*, 427 F.Supp. 434 (W.D.Mo.1976); (2) to fix the amount of compensation to be paid to the tenant as the fair market value "which [said] . . . structure[s] . . . contributes to the fair market value of the real property to be acquired . . . ." 42 U.S.C. § 4652(b)(1); *see also, Richards-Dowdle, Inc. v. State*, 52 Misc.2d 416, 276 N.Y. S.2d 795 (1966); *United States v. 40.00 Acres of Land, More or Less, supra*. To accomplish both of these purposes, the structure "shall be deemed to be a part of the real property to be acquired."

■ We therefore hold that the prior judgment and the federal act did not transform Eller's ownership in the billboards themselves from that of a personal property interest into a real property interest. Eller's ownership interest in the billboards both before and after the taking as between it and its landlord, was personal property ownership. What the prior judgment did accomplish, which is consistent with the federal act, was to require Scottsdale to pay compensation based upon fair market value of the billboards themselves.

The characterization of Eller's interest in the billboards themselves as personalty is important, since 42 U.S.C. § 4602(b) provides:

"(b) Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power

---

**4.** Admittedly, Eller has a "leasehold" interest which is an interest in real property. However, Eller has not sought damages for the taking of this leasehold interest, that is, the economic value of the rental over and above the actual rental paid reduced to present value, although we see no reason why this could not be a proper element of damages. Also, its entire leasehold interest was taken and therefore severance damages would not be proper. *See,*

*County of Maricopa v. Shell Oil Company*, 84 Ariz. 325, 327 P.2d 1005 (1958).

**5.** For a discussion of whether removable tenant fixtures, in a condemnation action, are considered personalty or realty, *see* 5 American Law of Property, § 19.11 at 42–43 (Casner Ed. 1952); *see also, Gilbert v. State*, 85 Ariz. 321, 338 P.2d 787 (1959).

of eminent domain, any element of value or *of damage[s]* in existence immediately prior to January 2, 1971." (emphasis added)

Thus, while Eller's personal property may be "deemed" to be part of the real property for the purposes of requiring compensation to be paid and determining its fair market value, such personal property interest does not provide for any other damages not recognizable prior to January 2, 1971. In Arizona, prior to January 2, 1971, under A.R.S. § 12–1122, severance damages are only collectible for the partial taking of a whole parcel of *real* property. *See, State ex rel. Morrison v. Jay Six Cattle Co.,* 88 Ariz. 97, 353 P.2d 185 (1960). Since the billboards were personal property, regardless of any incidental damages suffered, such damage was not compensable under Arizona law. A.R.S. § 12–1122. It therefore follows that the trial court's judgment allowing severance damages is incorrect and must be reversed.

## FAIR MARKET VALUE

While we have held that Eller's interest in these billboards was personalty, the prior judgment and the federal act required the trial court to determine the fair market value of that personalty. In echoing the act, the prior judgment provided that Scottsdale "must pay to [Eller] either the fair market value of the structure or the fair market value which said structure contributes to the fair market value of the property, whichever is greater." Eller did not attempt to prove the latter measure of damages.

Scottsdale's basic attack upon the methodology employed by Eller's expert in arriving at a fair market value is that this methodology compensates Eller for loss of business profits, which it contends under Arizona law is prohibited, citing *State v. Carrow,* 57 Ariz. 429, 114 P.2d 891 (1941).

■ What this attack overlooks is that the "income approach" is one of the three traditional appraisal approaches,[6] recognized by most courts in determining market value. *See, City of Tucson v. Rickles,* 109 Ariz. 82, 85, 505 P.2d 253, 256 (1973); *State v. Hollis,* 93 Ariz. 200, 379 P.2d 750 (1963); 4 Nichols, The Law of Eminent Domain, § 13.35[2] (Rev. 3rd ed. 1976). Inherent in the income approach to valuation is a consideration of the "profits" in the nature of rentals generated by the property. As is stated in 1 Orgel, Valuation Under Eminent Domain § 179 (2d Ed. 1953):

> "Although, courts and text book writers have often stated that, as a general rule, income in the nature of profits from a business is not admissible evidence of the value of the premises on which the business is located, they have also stated that, as a general rule, income in the nature of rentals is admissible."

The problem that Scottsdale has not focused on is whether the income approach is applicable to the taking of Eller's outdoor advertising structures and if such an approach is applicable, whether the capitalization figure utilized by the expert is valid. We will discuss these problems in the order presented.

■ As previously indicated the income approach to evaluation is a valid appraisal technique. The validity of this approach is based upon the theory that the market value of the property is the present worth of the net income it will produce during the remainder of its productive life. 4 Nichols, The Law of Eminent Domain, § 13.35[2](a) (Rev. 3rd ed. 1976). This in theory is what informed buyers and sellers are concerned about in the purchase and sale of income property. However, the income approach to appraising is subject to several important limitations. First, the property itself must be income producing rather than simply income being produced by a business being conducted thereon. *Levitin v. State,* 12 A.D.2d 6, 207 N.Y.S.2d 798 (1960); *State v. Lewis,* 142 So.2d 652 (La.App.1962).

---

**6.** The other two recognized appraisal methods are the "market data" or sales approach and the "cost approach" that is, reproduction cost less depreciation.

Second, insofar as billboards themselves are concerned, if the billboard can be relocated in the same area, an income approach to appraising is improper. *See, City of Newport Municipal Housing Commission v. Turner Advertising, Inc.,* 334 S.W.2d 767 (Ky.App.1960). *See generally,* Annot., 73 A.L.R.3d 1122. However, where a taking results in the entire removal of an outdoor advertising company's signs in a given market area, the income approach to market value is admissible. *See, State v. Obie Advertising, Inc.,* 9 Wash.App. 943, 516 P.2d 233 (1973).

■ With these limitations in mind, we will review the evidence presented in this case. First, there is no question that the outdoor advertising business in general and Eller in particular derives its income primarily, if not exclusively, from the "leasing" of its outdoor advertising panels, that is, renting various numbers of panels comprising a showing to advertisers. In our opinion, this evidence is sufficient, or at least raises a question of fact, as to whether the billboards themselves are income producing to satisfy the first requirement of using the income approach to valuation and allow this theory to go to the trier of fact. Having met this threshold requirement, testimony as to Eller's net income attributable to these signs was also admissible, not as damages to the business, or as evidence of highest and best use (billboards admitting to only one use—advertising) but as the basis for the expert's opinion of fair market value.

The real problem involved in the use of the income appraisal approach for billboards centers on whether they can be relocated in the market area.

■ In our opinion, this issue must be resolved on the basis of the character of billboards as income producing units. In this regard, billboard locations, as compared to billboards themselves, are unique. Depending upon the viewable distance in either direction, the amount of traffic passing the location, and the type of viewing public, a location of a particular billboard may have a value over and above its nuts and bolts value. In this sense, in the billboard industry, it is virtually impossible to separate location from the structure. Thus, when a condemning body takes the underlying land and forces the removal of that billboard, it takes not only the physical structure involved, it also takes the location which may have a value in excess of the "bonus" value of the underlying lease. If the owner can relocate the structure at a similar site, obviously the loss of the previous location may not be significant. However, if such a relocation site is not available (and this is more likely to occur in urban areas than in rural areas) in order to fully compensate the owner for its loss, reproduction costs less depreciation may not be a proper measure of the fair market value of the structure. Because of the uniqueness of this location, a single billboard must be considered as a separate unit. In such a case, the use of the income approach (which, as here, takes into consideration the particular location involved) may be the best appraising tool.[7]

■ Whether the income approach is justified in any particular billboard taking is a question of fact. Here, the evidence showed that Scottsdale is a highly desirable outdoor advertising area because of the higher than average income of its inhabitants, its reputation as a tourist attraction, and its desirability as a shopping area. The evidence further showed that because of the Scottsdale ordinance, the six billboards could not be relocated within the Scottsdale city limits. No evidence was introduced to show that even in face of the Scottsdale ordinance, other locations in the market area would be as desirable as the location taken. Eller's expert testified that because of the complete lack of similar sales, the market data approach to valuation was im-

---

**7.** We held that "severance" damages are not available on the ground that the billboards themselves are personalty. However, that holding can also be justified on the theory that the entire taking of the single unit, where the taking of the location is also compensated, does not result in severance damages to the remainder.

proper. He further testified that because of the inability to relocate in the Scottsdale city limits, the cost approach was also not satisfactory.

Under this state of the evidence, we hold that the trial court was justified in submitting to the jury an expert's opinion based upon the income approach to market value.

We turn now to the capitalization figure utilized by Eller's expert. Inherent in the income approach to market value is the use of a "capitalization" figure to arrive at that value. The accepted appraising method is to determine the estimated net return over the estimated life of the improvement, which net return is capitalized at a rate which will provide for the recapture of the investment, plus a proper return to the investor. *United States v. Tampa Bay Garden Apartments, Inc.,* 294 F.2d 598 (5th Cir., 1961). Normally, the capitalization rate is determined by a rate of return on similar investments. *United States v. Leavell & Ponder, Inc.,* 286 F.2d 398 (5th Cir. 1961).

Thus, for example, if comparable sales of apartment houses show that apartment houses are selling for three times the amount of their annual net rentals, a proper capitalization rate on the income approach to appraising apartment houses would be three. *See, United States v. Certain Interests in Property, etc.,* 186 F.Supp. 167 (N.D. Cal.1960).

In this case, Eller's expert determined from comparable sales of entire billboard companies that the average selling price of these companies exceeded their annual income by 2.16 (designated by the expert as the "income multiplier".) Scottsdale attacks this method on the basis that "since the purpose of an eminent domain proceeding is to determine the value of, or adjust compensation for, real property and not a business operated on the real property" the use of these comparable sales is improper. This argument overlooks an important distinction articulated in *United States v. Certain Interests in Property, etc., supra,* at 169.

"The Court is of the opinion that there is a distinction between:

"(1) The use of comparable sales as direct proof of the value of the condemned property, and

"(2) The use of the sales price of comparable property by an expert—along with noncomparable property such as stocks, bonds and dissimilar real estate— to arrive at prevailing market conditions and thus be able, after consideration of the risk involved in various sales, to set a realistic and just *capitalization rate* for the property condemned." (emphasis added)

We would agree that if Eller's expert had offered the evidence of comparable sales for the purpose of "direct proof of the value of the condemned property," Scottsdale's argument would have validity. However, this evidence was not offered for this purpose but rather as a factor in allowing the expert to determine "a realistic and just capitalization rate for the property condemned." As such, it was admissible.

Scottsdale also argues that since all of the comparable sales involved Eller's company as buyers, the information as to the sales was supplied by Eller, the sales included purchase of non-billboard assets, and that the sales price included stock, the comparable sales information was invalid. In our opinion, these objections go to the weight to be given the expert's opinion rather than to its admissibility. *See, Bullard v. Stonebraker,* 101 Ariz. 584, 422 P.2d 700 (1967).

While we are not prepared to give a carte blanc endorsement of the methods used by Eller's expert to determine a just capitalization rate, under the evidence presented here and the posture of this litigation, we hold that the expert opinion, including the capitalization rate utilized was admissible.

## EXCLUDING TESTIMONY OF EXPERT BASED ON HEARSAY

The trial court sustained an objection to any testimony of Scottsdale's expert on the

ground that the figures utilized by this expert to establish reproduction costs was hearsay. This was error.

■ We believe the proper test as to the admissibility of an expert's opinion where hearsay is involved is stated in *City of Renton v. Scott Pacific Terminal, Inc.,* 9 Wash.App. 364, 512 P.2d 1137 (1973), quoting from *State v. Wineberg,* 74 Wash.2d 372, 383, 444 P.2d 787, 794 (1968):

". . . an expert witness will not be allowed to testify to a valuation opinion which is not the product of his independent judgment, but is merely another person's hearsay opinion which the witness has accepted as his own; but . . an expert witness may, in the trial court's discretion, be allowed to testify to a valuation opinion even though some of the factors considered by the expert in reaching his opinion would be hearsay and inadmissible as independent evidence. We now hold that, when an expert is allowed to testify to a valuation opinion which is in part based on facts which would normally be hearsay and inadmissible as independent evidence, the trial court may in its discretion allow the expert to state such facts for the purpose of showing the basis of the opinion. The exclusion of such evidence, however, must be based on a sound exercise of discretion and not on an erroneous application of the hearsay and best evidence rules." 512 P.2d at 1142.

■ The alleged hearsay evidence upon which Scottsdale's expert relied in reaching his opinion as to valuation was a schedule of average reproduction costs of billboards prepared by the Arizona Highway Department in compliance with the Federal Highway Beautification Act of 1965. In our opinion, this type of evidence falls within the second category of testimony as characterized by the Washington Court in *City of Renton,* and therefore a hearsay objection would not lie.

We further note that this type of schedule may well fall within the category of "a type reasonably relied upon" as set forth in Rule 703, Arizona Rules of Evidence,[8] which provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

We hold that the exclusion of this expert's testimony on the basis of hearsay was error. Since there is no contention that such an opinion was not material to the issue in dispute—the market value of the billboards—its exclusion and the subsequent directed verdict on market value was reversible error.

Scottsdale also contends that the trial court's failure to offset the reasonable rental value of the underlying ground between Scottsdale's ownership attaching and the removal of the signs was error. We agree with Scottsdale's position that the prior judgment did not determine that Eller was to hold possession of the location of its signs rent free. However, prior to trial, the trial court determined that the amount of such rental was *de minimus.* Scottsdale has failed to show that such a ruling was erroneous. Since we reverse in this matter, Scottsdale, on the new trial can possibly correct this oversight.

Scottsdale has also urged that certain instructions were improperly excluded. As we reversed and because the legal context of those instructions are discussed in this opinion, we need not deal with them individually.

The judgment of the trial court is reversed and the matter remanded for a new trial in conformity with this opinion.

WREN, J., concurs.

EUBANK, Presiding Judge, specially concurring.

I agree that there can be no severance damages due appellee. Here, there was a

---

8. These rules were not in effect as of the time of the trial of this matter.

*whole* taking of Eller's leasehold interest, not a *part* of taking of it. *See* A.R.S. § 12–1122. I also agree that the trial court erred in barring the testimony of Scottsdale's expert witness. His opinion was based on the reproduction cost less depreciation approach to the valuation of the billboards. The fact that part of his information was based on hearsay evidence makes no difference. Such matters go to the weight of the expert's testimony. On these two bases alone reversal is required.

Since this case is to be retried, I believe it is necessary to point out several problems that I see. First, 42 U.S.C. § 4601 et seq. does not change the nature of the estate being condemned: a leasehold estate. Under our law, the only market value to a lessee such as Eller in the event of condemnation is the economic value of the rental over and above the actual rental paid reduced to present value. *See County of Maricopa v. Shell Oil Co.,* 84 Ariz. 325, 327 P.2d 1005 (1958). This has been termed "bonus value." In determining this value, the length of time that the lease has to run, the rent to be paid, and the various obligations of the parties under the lease are relevant to the price that a willing, informed buyer and a willing, informed seller of the lessee's interest would pay for the leasehold interest. This price is fair market value or just compensation which is required by Article 2, Section 17, Arizona Constitution, 1 A.R.S.

Second, the market value of Eller's leasehold is complicated because 42 U.S.C. § 4652 requires the payment of "Just Compensation PLUS." This is just compensation plus an additional amount of compensation: either the amount the billboards enhance the value of the real property, or, if greater, the value of the structure in place, notwithstanding the obligation under the lease to remove the structures at the expiration of the lease. 42 U.S.C. § 4652. I believe this means that just compensation will include either the bonus value of the lease, if any, plus enhancement value, or the bonus value plus purchase of the billboards, whichever is greater. *See U. S. v. 40.00 Acres of Land, More or Less,* 427 F.Supp. 434 (W.D.Mo. 1976).

Third, I agree that the income approach to value is proper evidence of value. However, Eller's approach, set out in the main opinion, is not properly the income approach as I understand it. The income approach applied to the billboards would be the income produced by the six billboards, less rent and expenses, capitalized and then adjusted for the remaining term of the lease. The difference between this value and the rent would be the bonus value, if any. Eller's approach to value consisted of its personal business loss due to the taking of six billboards out of the Company's inventory of billboards. This is a form of severance damage to Eller's going business; it is a form of business loss to appellee's going concern value; it treats different estates in property as equal, and in particular treats the leasehold as the real property interest. This cannot be done because the real property interest is owned by Scottsdale.

Fourth, I agree that the trial court erred in not offsetting rent. Obviously, if Eller remained on the real property under its lease, the lessor would be entitled to the lease rent. Since the lease provided for such a contingency, its provisions should have been enforced.